MARSHALL CONSTRUCTION COMPANY, LIMITED,
v. LYMAN H. BIGELOW, JAMES WAKEFIELD,
JAMES L. FRIEL, JAMES WINNE AND SHER-
WOOD LOWREY, MEMBERS OF THE BOARD OF
HARBOR COMMISSIONERS.

No. 1711.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT.
HON. E. K. MASSEE, JUDGE.

ARGUED JANUARY 12, 13, 1927.          DECIDED FEBRUARY 23, 1927.

PERRY, C. J., BANKS AND PARSONS, JJ.

OFFICERS—*public contracts—right to reject all bids.*
> The rejection by the board of harbor commissioners of all bids
> submitted for the construction of a wharf is legal when the
> board, acting in good faith, believes (a) that the bid containing
> the lowest lump-sum proposal may, because of the unit prices
> offered, prove to be the highest in the aggregate under the cir-
> cumstances of the case, (b) that both bids may, under the cir-
> cumstances, prove to be too high for the appropriation and (c)
> that such action is in the best interests of the public.

OPINION OF THE COURT BY PERRY, C. J.

This is a petition for a writ of mandamus to be di-
rected to the members of the board of harbor commission-
ers of the Territory of Hawaii to compel them to award
to the petitioner the contract for the construction of a
wharf and approach thereto at Kaunakakai on the Island
of Molokai. The allegations of the petition and of the
alternative writ are that upon plans and specifications
prepared by the board the petitioner and the Hawaiian
Dredging Company, Limited, presented bids; that "by
virtue of petitioner's said tender petitioner became and
was the lowest responsible bidder" but that, neverthe-
less, both bids were rejected by the board; and that "pe-

titioner's said tender was rejected by said board, not in the exercise of any discretion vested in it, or the members thereof, by law, but arbitrarily and capriciously, and upon the pretext and subterfuge that said tender was not, or might not be, the lowest tender." A demurrer by the respondents was ordered overruled by this court (29 Haw. 48), the ruling being that the allegation above quoted, to the effect that the board's action was arbitrary and capricious, was an allegation of fact, susceptible of proof, and not a mere conclusion of law. This court said that mandamus will lie "where there has been a palpable abuse of discretion, that discretion must always be reasonably, fairly and impartially exercised, in good faith, and that whether or not it has been so exercised is a question for the courts"; and it also said that "there can be no doubt that a writ of mandamus will not issue to direct or control the judgment or discretion of public officers." Thereafter the respondents filed a return or answer to the alternative writ, setting forth the history of the case at some length, denying that the petitioner was the lowest bidder, asserting that the price bid by the petitioner upon certain units "was so large and so disproportionate to the remainder of the bid, that the cost of the improvement under a contract with such bidder would have been greater, or probably greater, than if such contract were awarded to said Hawaiian Dredging Company, Limited," alleging that the petitioner's bid was "unbalanced" and that an award of the contract to it "would have been detrimental to the public interest," that the respondents "by reason of said exorbitant unit prices of said bid" (of the petitioner) "could not be sure that sufficient money had been appropriated by the legislature to complete a contract let in accordance with said bid" and that respondents, "after a full consideration of the bids and of the specifications," rejected both bids

"believing that such action was necessary to subserve the public interest and believing that the bids were too high." After hearing evidence the trial judge found the facts to be in accordance with the allegations of the petitioner's bill and entered judgment ordering a peremptory mandate to issue as prayed for. From that judgment the respondents appealed to this court.

Plans and specifications for the improvement in question were prepared by the board of harbor commissioners and were furnished to intending bidders as the basis of the bids to be offered. Upon the first call for tenders one bid only was presented, that being by the Hawaiian Dredging Company, Limited, and in the sum of $167,120. The appropriation at that time available for payment of the cost of the project was in the sum of $125,000. Shortly after the presentation and opening of this bid the legislature was in session and increased the appropriation to $175,000. Nevertheless the bid of the dredging company was rejected by the board. Bids were called for a second time. Two were presented, one by the Hawaiian Dredging Company, Limited, in the same sum of $167,120 and one by the Marshall Construction Company, Limited, in the sum of $158,273.50. These were the "lump-sum proposals," as they have been called in this case; but in each tender there were certain additional prices bid, which will be hereafter referred to. Both of these bids were rejected by the board. Thereupon the present proceeding was instituted by the petitioner to compel the acceptance of its bid and the awarding of the contract to it.

An important contention of the petitioner underlying the whole of its position and argument is that the determination of who was the lowest bidder in response to the second call for bids should be based upon a consideration of the lump-sum bids alone and without refer-

ence to the other prices named in the tenders. Generally speaking, the specifications called for the construction of a concrete wharf, approach thereto and shed in the waters of the harbor at Kaunakakai and provided that "the lengths of reinforced concrete piles, namely, 35 feet for the approach and 50 feet for the main wharf, shall be from the point of the pile to the cut off. These lengths shall be used for bid in item 1 so that all contractors will bid upon the same basis." The forms of the tenders were likewise prepared by the board with blanks merely for the insertion of prices' and the number of days required for the performance of the contract. The call required that bids should be upon those forms and none other, that *all* of the blanks for prices should be filled in and that failure to do so would constitute sufficient cause for rejection of the whole proposal. In item 1 of the tenders bidders were required to state the sum of money for which they would agree to construct the wharf project, including the furnishing of all labor, materials and equipment, and to state the time within which performance would be had. It was in response to item 1 and as a part thereof that the so-called lump-sum bids were furnished by the two bidders. In item 2 of the tender bidders were required to state the amount which they were willing to deduct in case a wooden deck should be substituted for the concrete deck for both wharf and approach. In item 3 they were required to state the amount deductible in case a wooden deck were substituted for the concrete deck on the approach only. Then came the following statement, in the form of tender: "Unit prices required are for the purpose of computing additions, deductions and omissions as provided for in section 3 of the general specifications and shall be applied to any work in connection with this project. Any evasion of or failure to comply with the requirements of

this paragraph, in so far as it applies to the submitting of data required by this proposal, shall constitute a sufficient cause for the rejection of a proposal." Following this statement of the purpose of the unit prices and of the penalty for failure to furnish them came items 4 to 15 inclusive. In item 4 bidders were required to state the price per linear foot "for 18″ x 18″ reinforced concrete piles driven complete in place, cut off and prepared to receive deck construction"; in item 5, the price per cubic yard "for reinforced concrete construction complete in place, including steel reinforcement"; in item 6, the price per 1000 feet board measure "for furnishing complete in place deck timber construction"; in item 7, the price to be added or deducted "for each eleven (11) foot bay of reinforced concrete deck construction to be added or deducted from the outer end of the main wharf complete, including fenders etc.;" in item 8, the amount to be added to item 1 "if #12 gauge corrugated zinc is substituted for the corrugated iron as called for for the covering for the roof and sides of the shed"; in item 9, the amount to be added per bay to the lump-sum bid in item 1 "if one or more eleven (11) foot bays are added to the mauka end of the shed"; in item 10, the amount to be deducted from the lump-sum bid in item 1 "if the complete shed as shown on the plans is omitted"; in item 11, the price "per lineal foot of pile complete in place" for "wooden splice piles for lengthening out concrete piles"; in item 12, the price for "reinforced concrete socket for splicing wooden and concrete piles together"; in item 13, the price to be deducted from the lump-sum bid in item 1 "for each fifteen (15) foot bent of reinforced concrete deck constructoin deducted from the approach" (a memo being inserted at this point that "if any of the bents in the approach are deducted, the location of the main wharf will be moved shoreward cor-

respondingly") ; in item 14, the price per lineal foot "for 18″ x 18″ reinforced concrete piles driven complete in place over 50 feet in length on main wharf"; and in item 15, the price per lineal foot "for 18″ x 18″ reinforced concrete piles driven complete in place over 35 feet in length on approach."

The plans and specifications stated in detail the requirements as to the materials and method of construction of the concrete piles to be used in the project; and the specifications also contained statements of the requirements concerning wooden piles to be used. Under "Miscellaneous Specifications," on pages 32 and 33, the following appears:

"1.   Any timber piles required for this project shall be Douglas Fir, shall be sound, free from bell ends, double crooks, projecting stubs, large or unsound knots, wind shakes, cracks or other defects impairing their strength or durability. Piles shall be so nearly straight that a straight line joining the centers of the ends shall be entirely within the pile body. Piles shall be free from damage by sea worms or other insects, shall be peeled from bark and shall have all knots smoothly dressed.

"2.   Piles twenty feet in length and under shall have a minimum butt diameter of 11 inches. Piles between twenty feet and thirty feet in length shall have a minimum butt diameter of 12 inches, piles over thirty feet to have a minimum butt diameter of 16 inches.

"3.   Timber piles required for this project shall be driven to refusal or to a depth giving a resistance equal to a carrying value on the pile in question of twenty tons, computed on the pile bearing formula commonly known as 'Engineering News Formula' and expressed

"$D = (2 \, WH \div S + 1/10)$

"4.   Piles shall be driven plumb and true to line in

the exact locations indicated or delineated on the plans.

"5. Piles shall be driven by a steam hammer of a size and type approved by the engineer."

With reference to the method of splicing wooden piles and concrete piles the following statement is set forth: "6. In case piles are spliced concrete sockets or concrete socket piles will be used as per details shown on supplementary sheet H. C. 473.1A supplementing sheet H. C. 473.1."

In the plans which were a part of the basis of the bids, on sheet H. C. 473.1, which prescribed in part at least the form and composition of the concrete piles, the notation appears, "total length variable, dependent upon contractor's judgment." This is made the basis of a claim by the petitioner that after the awarding of the contract the contractor and not the board of harbor commissioners or its engineer or other representative would be the sole judge of the length of the concrete piles to be used in the project and that if upon actual performance of the work it should appear that piles longer than fifty feet in the main wharf and thirty-five feet in the approach were necessary the contractor alone would determine whether such piles should be wholly concrete or partly concrete and partly wooden. This contention cannot be sustained. Section 3 of the specifications, entitled "Changes, Additions, Deductions, Omissions and Schedule of Prices," provides as follows: "1. The board of harbor commissioners reserves the right to make changes in detail of construction where such changes become necessary, or, in the opinion of the engineer, advisable and to the interest of the Territory. Said changes shall be made on written order from the board. In such cases it is expressly agreed that any materials of any class or nature called for by the original contract and affected by the authorized change shall, upon

written order from the engineer, be utilized as he may direct, in whole or in part, in the portion of the work constructed under the authorized change and that no additional charge shall be made to the Territory for such materials. In case the authorized changes described above necessitate an increased amount of labor, or the use of additional equipment or materials entailing an additional cost to the contractor, it is hereby agreed that the Territory will reimburse the contractor for such additional costs, same to be determined by the engineer, at cost plus 15% as hereinafter described (sub-paragraphs 6, A, B, C, D, E, F, G and H); except those items for which a unit price is submitted with the proposal, said items of cost to be shown in detail by bills submitted covering the cost of the same and bearing the approval and certification of the engineer. 2. The board of harbor commissioners reserves the right to increase, diminish or omit any item or items or any portion of any item or items of construction, materials or labor from this contract." Section 4 of the specifications, entitled "Engineering Work," further provides that "the engineer will furnish the requisite bench elevations and shall indicate to the contractor the lines and dimensions required by the plans; will check and pass upon all engineering work as described above, and his decision as to what work is required, the methods to be employed and the satisfactory performance of the same shall be final." In the more general specifications it is also provided that "the board reserves the right to increase or diminish the work as shown on the plans and described in these specifications; and in such cases shall add to or deduct from the contract price, as the case may be, the value of such additions or deductions, based on the schedule filed with the contractor's tender, or on the unit price in tender; or should neither of the above be called for in the tender,

on a price mutually agreed upon prior to the execution of the work."

The notation above quoted from sheet H. C. 473.1 as to the length of the piles being variable, dependent upon the judgment of the contractor, evidently refers only to a preliminary determination of the length of piles to be cast, but subject always to the final right, expressly reserved as above shown, to the board and its representative on the ground to determine the method of construction, to make changes in details of construction and to increase or diminish the work in accordance with its view of the requirements of the public interest. In order, as it was thought when the plans were prepared, to secure bids based upon uniform requirements, the bids were invited for a structure located entirely above a level (as to the wharf proper) fifty feet below datum, which was mean low-water mark, and a level (as to the approach) thirty-five feet below the same datum. Nothing was required, in so far as the lump-sum bid in item 1 was concerned, by way of furnishing a structure to extend in any part below the fifty-foot level and the thirty-five-foot level just mentioned. But to our minds the language of the specifications is direct and unambiguous to the effect that if in the judgment of the board it should prove to be necessary or desirable, the board could, after the contract was entered into and at any time during the progress of the work, call for an extension of that structure or of its supports to any point designated below those two levels. The board's reserved right to "make changes in detail of construction" included the right to order the use of wooden piles below the thirty-five and fifty-foot levels, even against the contractor's judgment and desire that concrete piles be used below those levels and irrespective of whether the con-

tractor was given primarily by the notation on the plans the right to determine the length of the piles.

The evidence was undisputed that prior to the preparation of the plans and specifications the board, through an agent named Hobart, had eight "wash borings" made in the ocean bottom at Kaunakakai within the limits of the proposed wharf and approach. It is not disputed that by training and experience Hobart was well qualified to make the borings and to describe the materials found in the course of the borings, although it is contended by the petitioner that wash borings are not a reliable method of ascertaining the nature of the materials composing the ocean bottom. All of the eight borings were made to a depth of over 100 feet from the surface of the water. Hobart testified that "in nearly every instance, from thirty feet down to 100 feet below we got soft fine sand with a mud or some foreign matter in it, enough to make it slip easy, make it stand up, that it is not hard, which it would not do if it were plain sand; in other words, plain sand will stop a pile perhaps one-fifth or one-third the distance that sand and mud and some foreign condition, just like grease under a ship when they launch a ship. Mud and foreign matter acts as a lubricant. * * * The holes were very uniform, in nearly all the holes, from approximately—in all holes, from approximately 30 feet to 100 feet, was this fine sand with mud or some foreign matter." The results of the eight borings, including the nature of the materials found and the depths of the borings, were all reported to the board before bids were called for. They were rendered available to intending bidders but the specifications made it clear that the board made no representations to contractors as to the nature of the ocean bottom but placed the sole responsibility for surprises in that respect upon the bidders. The petitioner in this case made no other

borings. There were none other. There is no other evi-
dence before the court as to the nature of the ocean
bottom based upon actual experiments or work. One of
the officers of the plaintiff corporation testified that be-
fore bidding he had obtained information from the per-
son who built the old or existing wharf at Kaunakakai as
to the experience he had had in driving piles at that
place but he did not indicate what that information was.

The specifications were prepared in the light of the
knowledge which the board had gained through Hobart
as to the nature of the ocean bottom at Kaunakakai and
of the experience it had had in the construction of other
wharves in the Territory. Experience had taught the
board that the length of piles required in any wharf
project cannot be foretold by any one with anything
approaching certainty. The specifications were therefore
drawn so as to call, in item 1, for a bid for a wharf and
an approach constructed entirely above the fifty-foot
level and the thirty-five-foot level, respectively. Item 1,
however, was not the only item in which the board called
for information as to the cost of the project. Each and
all of the remaining fourteen items, with the answers
thereto, were designed for the same purpose. Item 11,
referring to wooden piles to be used in extension of the
concrete piles below the fifty and the thirty-five-foot
levels, was as clearly an essential part of the bids re-
quired and the bids under that item were necessary to be
considered by the board in arriving at a determination
of the questions (a) as to who was the lowest bidder
and (b) as to whether either or both bids were for total
amounts within the appropriation after making proper
deductions or reservations of moneys for inspection by
engineers and other necessary expenditures. It is easy
to understand that if the circumstances proved to require
piles of a sufficient length the bid of the petitioner of $5

per linear foot for wooden piles would, together with its lump-sum bid, result in an aggregate higher than that of the bid of its opponent at $1.20 per linear foot for wooden piles taken in conjunction with its lump-sum bid. The power to prescribe wooden piles below the fifty-foot and thirty-five-foot levels was vested in the board. It is easy to understand, also, that with the piles going down to a certain depth both bids in the aggregate would prove to be larger than the appropriation of $175,000, after deducting necessary expenses of supervision and other incidentals.

It is not within the province of this court to decide to what depths the piles would go in the structure and its various parts in order to attain the required resistance. The executive officer of the petitioner testified that in his judgment the piles would not go deeper than thirty-five feet in the approach and fifty feet in the wharf proper, while the superintendent of public works, who is the chairman of the board of harbor commissioners and an engineer by profession, testified that in his judgment they would go 100 feet throughout. The evidence abundantly shows that honest men, conscientiously endeavoring to perform their trust towards the public and acting entirely in good faith and without ulterior motives, could reasonably believe upon the information which the members of the harbor board had in their possession that the piles would all go to a depth of 100 feet or more before attaining the required resistance and could reasonably believe that the best method of construction in such a case and the only practicable method under the circumstances would be to use wooden piles below and concrete piles above, with the two joined together or held in place by a movable socket, or to have a concrete socket pile above, that is, a pile with the socket as a part of it at the lower end.

Item 11, therefore, in which the bidders stated the cost which they would charge per linear foot for wooden piles to be used in the way just referred to, was not only a proper part but an important part of the bids. It was in reality as much a part of the bids as item 1 was and was properly to be considered in determining whether either or both of the bids would, if accepted, produce a structure, costing in the aggregate less or more than the amount of the appropriation available. All of the other items, too, upon which bids were called for, were properly parts of the bids and could be considered by the board in determining whether a contract could be awarded at all and, if so, who was the lowest bidder. The various items might possibly differ in degree of importance but they all had their value in assisting the board to determine the nature of the structure in question.

It may be that specifications such as these, which were capable of showing when bid upon that one bidder was the lowest bidder, if experience should show that the piles would go to a certain depth and of showing, on the other hand, that another bidder would be the lowest bidder if the piles should go to a certain other depth, are of such a nature that bids could not lawfully be predicated upon them and that a contract could not lawfully be awarded upon the bids received. That question need not be determined in this case. If the specifications are of such a nature that bids and a contract could not lawfully be based upon them a writ of mandamus cannot now be issued to compel the board to award such an illegal contract. Assuming, on the other hand, in favor of the petitioner, that the specifications could form a legal basis for bids and an award of contract the same result is reached, for we find upon the evidence that the members of the harbor board in rejecting both bids acted

entirely in good faith and in the endeavor only to serve their masters, the public, faithfully and to the best of their ability and hold that the rejection of both bids was within their powers and lawful. Of the members of the harbor board Mr. Bigelow alone testified. None of the others were called to the stand. The presumption is that the respondents acted in good faith and the burden was upon the petitioner to show the contrary. There is nothing in the evidence to support a finding of bad faith or of actual fraud of any kind. There is nothing in the evidence to show that the board or any of its members was possessed of any improper motive in determining to reject the two bids. Ordinarily, at least, when a charge of bad faith is sustained one would expect to find some ulterior motive actuating the parties charged. It certainly could not have been favoritism towards the Hawaiian Dredging Company, the only competing bidder, for the bid of that company was rejected at a time when it was the only bidder and when its bid could easily have been accepted if the purpose of the board was fraudulent.

In spite of the petitioner's belief and testimony that the piles would not go deeper than thirty-five feet and fifty feet, it was easily possible that the completion of the construction of the wharf would leave the Territory in debt to the contractor in an amount far in excess of the appropriation of $175,000. Public officers owe a duty to the public not to enter into contracts where that possibility exists.

It is contended that the minutes of the meetings of the board at which the two bids in question were considered and finally rejected show that only one ground was advanced at that time by the chairman of the board as a reason for rejecting the bids and that that was that the bid of the petitioner was "unbalanced" and might

prove to be the higher bid of the two; and that the minutes do not show that the board had any other reason for rejecting both bids.   The law, however, does not require that the reasons moving the members of the board in taking action be set forth in the minutes in order to be available to them thereafter in defense of their action when attacked in court.   It does not even require that the members should state either in writing or orally at a meeting or meetings of the board what their reasons are.   One member may be actuated by one lawful reason and another by another lawful reason.   They may all remain silent at the meetings except to cast their votes in favor of rejection and yet their acts may be valid.   If the history and the circumstances of the case are such that the court can find from the evidence that reasonable men, acting in good faith only, could reach the conclusion which they did reach, rejecting both bids, their action must, in the absence of evidence of fraud or wrong motive, be sustained.   The discretion to act was theirs and is not given to the court.   The court cannot pass upon the facts in review of their judgment further than to find whether they acted in good faith, for one or more of the reasons named in the statute, and reasonably could have so acted.   Section 1478, R. L. 1925, specifically provides that "when the officer advertising for bids believes that the prices bid are too high * * * or that the public interest will be subserved thereby, he may reject all bids."   It is apparent from the evidence that the members of the board, basing their action upon their experience generally and their views of the nature of the ocean bottom at Kaunakakai and their beliefs as to the depths the piles would go in order to attain the necessary resistance, rejected the bids because they believed (a) that the petitioner's bid would probably prove to be the higher, (b) that both bids would probably prove

to be too high for the appropriation and (c) that such action was to the best interests of the public. Under these circumstances, the rejection was lawful.

The decree appealed from is reversed and set aside and the alternative writ of mandamus is dismissed.

*A. G. M. Robertson* (*Robertson & Castle* on the briefs) for petitioner.

*Marguerite K. Ashford,* Deputy Attorney General, and *F. E. Thompson* (*W. B. Lymer,* Attorney General, *Marguerite K. Ashford,* Deputy Attorney General, and *Thompson, Cathcart & Beebe* on the briefs) for respondents.