**PITTMAN CONSTRUCTION CO., Inc.,**

v.

**HOUSING AUTHORITY OF OPELOUSAS.**

No. 7030.

United States District Court
W. D. Louisiana,
Opelousas Division.

Oct. 1, 1958.

518

Gerald J. Gallinghouse of Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff.

Joe J. Tritico, Lake Charles, La., for defendant.

Robert F. DeJean, Opelousas, La., for intervenor.

HUNTER, District Judge.

Federal jurisdiction is pegged on diversity. The controlling statute is LSA–R.S. 38:2211 (Act 73 of 1926 as last amended by Act 589 of 1954), which provides in pertinent part:

"All public work to be done, exceeding the sum of two thousand five hundred dollars * * * by any public corporation or political subdivision of the state * * * shall be advertised and let by contract to the lowest responsible bidder who has bid according to the contract, plans and specifications as advertised; and no such public work shall be done * * * except as provided in this Part * * *" LSA–R.S. 38:2211.

"The governing authority desiring to let a contract * * * for the construction of public works, shall, in its resolution providing for the contract * * * and for the advertisement for bids, designate the time and place that the bids will be opened and the contract let; and shall at the place and time specified open the bids and let the contract. The governing authority may reject any and all bids." LSA–R.S. 38:2212.

"When any bid is accepted * * for the construction or doing of any public works, a written contract shall

be entered into by the successful bidder and the governing authority letting the contract, and the party to whom the contract is awarded shall furnish good and solvent bond in an amount not less than one-half of the amount of the contract, for the faithful performance of his duties." LSA–R.S. 38:2213.

" * * * any contract entered into for the construction of public works, contrary to the provision of this Part shall be null and void." LSA–R.S. 38:2215.

In chronological sequence, the pertinent and undisputed facts are these:

In April, 1958, defendant, acting through the Board of Commissioners (herein called the "Board") published advertisements, including an invitation for bids, for construction of a low-rent housing project to consist of 140 dwelling units.[1]

The advertisment specified that defendant would receive and open the bids on May 8.[2] However, this date was later postponed to May 22[3] by the Board at the request of H. J. Danel, who, as President of Danel-Ryder, Inc., was interested in bidding on the work, and another prospective bidder.[4]

This project had been under consideration for more than two years.[5] It was planned, and is being constructed and operated by defendant in cooperation with the Public Housing Administration (herein called "PHA") under the federal housing act of 1954.[6]

On May 22, the Board met, and opened, and read aloud the amounts of the nine bids which had been received. The four lowest bids were: (1) Danel-Ryder Construction Co., Inc. (herein called "Danel-Ryder")—$1,112,500; (2) Pittman Construction Co., Inc. (plaintiff herein)—$1,169,000; (3) Marco Construction Company, (sometimes referred to herein as "Marco", or intervenor)—$1,169,118;[7] and (4) Wohfield Construction Company—$1,172,500.[8]

The Board went into "executive session",[9] and passed a resolution[10] to award the contract to Danel-Ryder subject to PHA approval.[11]

The PHA refused to approve the Board's recommendation on the ground that Danel-Ryder was an ineligible bidder[13] because H. J. Danel (President and major stockholder of the company) had been a member of the Board until March 7, 1958.

The rejection by PHA of the Board's recommendation was expressed in a telegram[14] (dated May 28) from Marshall W. Amis (PHA Regional Director) to John Edwards (Chairman of the Board).

1. Def. admits (answer). Def. Ex. 1. At the time the Board was composed of five members, (1) John D. Edwards, Chairman (attorney); (2) Leo Carron, Vice-Chairman (auto dealer); (3) Randolph McCormick (glass and glazing contractor); (4) Wilbur Lanusse (hardware supplies); and (5) Henry Stubbs (teacher)—Edwards' Testimony, 1 Tr. 202.

2. Def. Ex. 1, page A–1.

3. Def. Ex. 1, Addendum 1 (issued April 21, 1958), page 1.

4. Stipulated in part, 1 Tr. 28. Leo Carron (Vice-Chairman of the Board) explained that these parties needed more time to prepare their bids, 6 Tr. 788.

5. Pl. Ex. 21. Amis telegram to Edwards (dated May 28), Def. Ex. 4 Amis, 5 Tr. 682.

6. 42 U.S.C.A. §§ 1401–1433. Edwards, 3 Tr. 320-2.

7. Def. Ex. 8.

8. Def. admits (answer).

9. The other five bids were considerably higher. It appears that Wohfield was never considered by the Board, which was content with the Marco bid.

10. Carron, 5 Tr. 734.

11. Def. Ex. 3. This resolution appears to have been passed in violation of LSA–R.S. 42:5–42:8 (Act 484 of 1952), which prohibits public bodies from taking any final or binding action during closed or executive meetings.

12. The annual contributions contract required PHA's formal approval as a condition precedent to the Board's award of the contract.

13. Def. admits (answer). Edwards, 2 Tr. 200, 201, 217.

14. Def. Ex. 4. Edwards, 2 Tr. 201, 286-9, 318. Article 51 of Specifications (page J–32), Def. Ex. 1.

The telegram concluded with this request: "Please submit promptly your formal recommendations of an award to an eligible bidder."

Soon after receipt of the foregoing telegram the Board requested plaintiff to have a representative attend a meeting to be held in Opelousas on the evening of Monday, June 2.[15] In response to this request, Albert E. Pittman (Secretary-Treasurer of plaintiff) attended the meeting, answered all questions put to him, and furnished all information requested of him, by members of the Board,[16] who seemed to be fairly satisfied with the disclosure.[17]

At about noon on Wednesday, June 4, Albert E. Pittman, accompanied by his father (Theodore A. Pittman, President of plaintiff), his brother (Charles R. Pittman, Vice-President of plaintiff), and Wayne Slagel (an estimator for plaintiff) visited and talked with Yorick Chachere (Executive Director of defendant) while they were driving through Opelousas on their way to New Iberia.[18]

On June 4th, Chairman Edwards communicated by telephone with Director Amis, and inquired as to whether PHA would approve the award of the contract to plaintiff.[19] The question was answered in the affirmative, and confirmed by telegram (dated June 4, 1958, wired at 4:29 P.M. and received in Opelousas at 5:03 P.M.),[20] which stated "If the Housing Authority of Opelousas recommends an award to Pittman Construction Company, we will approve it."

On that same evening, Randolph McCormick (a Board member), together with Leo Carron (Vice-Chairman of the Board), and Chachere came to the hotel room of Albert E. Pittman in New Iberia[21] (about 45 miles from Opelousas). According to Carron and Cachere, the idea of the trip originated with McCormick,[22] who, being in the glass business, was interested in getting the work for his glass company from plaintiff under the prime contract recently awarded to plaintiff by the United States for construction of the postoffice at Lafayette.[23] Albert E. Pittman informed McCormick that plaintiff would be glad to receive a quotation for the glass and glazing, but no commitment was made.

Just two days later (on Friday, June 6), the Board met, received evidence presented against plaintiff by Robert F. DeJean (attorney for Marco, third lowest bidder), and passed a resolution[24] (offered by Carron, seconded by McCormick) declaring the lowest responsible bidder to be, and awarding the contract to, Marco, subject to PHA approval. The Pittmans were not invited to this meeting.

As soon as plaintiff's officers learned about the Board's action, they protested the award (by telegrams dated June 7 to each Board member),[25] insisted that the contract be awarded to them as lowest responsible bidder, and requested a statement of the Board's position.

The Board did not reply to plaintiff's telegram, but proceeded to recommend to PHA (by letter dated June 9) that the contract be awarded to Marco.[26]

Meanwhile, on June 19, plaintiff engaged the law firm of Deutsch, Kerrigan

---

15. A. E. Pittman, 1 Tr. 31. Edwards, 2 Tr. 207.

16. A. E. Pittman, 1 Tr. 32. Edwards, 2 Tr. 215.

17. A. E. Pittman, 1 Tr. 38. Edwards, 2 Tr. 215.

18. A. E. Pittman, 1 Tr. 35, 36.

19. Edwards, 2 Tr. 218.

20. Pl. Ex. 3. Edwards, 2 Tr. 221. This telegram was dispatched by Amis within five minutes after Chachere requested same by telephone. (Amis, 5 Tr. 726).

21. A. E. Pittman, 1 Tr. 35, 36. Map attached to Pl. Ex. 24.

22. McCormick did not testify on trial of this case. A. E. Pittman says McCormick called him on June 3, 1 Tr. 34, 35.

23. Tr. 760.

24. Pl. Ex. 17. Edwards, 2 Tr. 241.

25. Pl. Ex. 4. Edwards, 2 Tr. 242-3.

26. Def. Ex. 7.

& Stiles, which, acting through Gerald Gallinghouse, requested (by telegram)[27] a meeting with the Board on the next day. This attorney, with Albert E. and Theodore A. Pittman, went to Opelousas, and prevailed on Chairman Edwards to call a meeting.[28] Defendant avers in its answer that this "hearing was granted for the purpose of redetermining whether or not there had been just cause for rejecting plaintiff's bid." [29]

The Board refused to alter its position at this meeting. As a result, plaintiff filed this suit.[30]

On June 25, this court (on plaintiff's motion) ordered, in effect, defendant and the members of the Board to show cause on July 7 why they should not be enjoined from executing the contract with Marco, and ordered to award the contract to, and execute the contract with, plaintiff.[31]

Later, plaintiff discovered that defendant had executed a contract with Marco on June 25 (the same date on which the order was signed),[32] whereupon it filed an amended complaint and prayer, in which it also asks that the purported contract be declared null and void, and that Marco be enjoined from doing any work thereunder.[33]

### Plaintiff's Contentions

In substance, plaintiff's main contentions are as follows:

(1) The public works statute (LSA–R.S. 38:2211–38:2217) is a prohibitory law founded on public policy. The requirement that "All public work * * shall be * * * let by contract to the lowest responsible bidder who has bid according to the contract, plans, and specifications as advertised" is mandatory and must be complied with by defendant.

(2) The determination of the lowest *responsible* bidder rests in the sound discretion of the Board; but this determination must be based on good, reasonable and sufficient reasons and sustained by the evidence, and is subject to review by the court. The Board's preference of the Marco's higher bid over plaintiff's bid was arbitrary and unreasonable, and must be set aside.

(3) Marco is not the lowest responsible bidder within the meaning of the statute. Therefore, the contract entered into by Marco and defendant under date of June 25, 1958 is contrary to the statute, and is null and void.

(4) Plaintiff is the lowest responsible bidder within the meaning of the statute. Defendant did not exercise its right to reject all bids, but elected to award the contract to one of the bidders. Therefore, plaintiff, as the lowest responsible bidder, is entitled to the contract.[34]

(5) Plaintiff will suffer permanent and irreparable injury, for which it has no adequate remedy at law, as a result of defendant's action in: (a) declaring that plaintiff was not the lowest responsible bidder; (b) refusing to award the contract to plaintiff, after deciding to accept one of the bids; and (c) awarding the contract to Marco. Therefore, plaintiff is entitled not only to a decree declaring the contract null and void, but to equitable relief in the form of a permanent injunc-

---

27. Pl. Ex. 5. A. E. Pittman, 1 Tr. 43–50. Edwards, 2 Tr. 244.

28. The Pittmans and Gallinghouse first went to Mr. Edwards' office in the morning. They did not get to see him, but were told by Mr. Edwards (through his secretary) to go to the Housing Authority Office, from which Gallinghouse talked with Edwards by telephone about the necessity for a meeting, which was held in the afternoon.

29. Article 22. Edwards, 2 Tr. 244; 3 Tr. 314.

30. The Board was advised at the conclusion of the June 20 meeting by Gal-

linghouse that plaintiff would file suit for injunctive relief as soon as possible.

31. Order annexed to original complaint.

32. Edwards, 2 Tr. 250–2 (the Board did not know that the suit had been filed until June 27).

33. Plaintiff's original and amending complaints.

34. In its instructions to bidders, defendant assured the bidders that the contract would be awarded to the lowest responsible bidder (Def. Ex. 8) likewise required defendant to let the contract to the lowest responsible bidder.

tion (prohibitory as to Marco, and mandatory as to plaintiff).

### Defenses of Defendant and Intervenor

The defendant Authority and Marco, Intervenor, contend:

(1) That plaintiff, as the unsuccessful bidder, is without interest to maintain an action to set aside the award, and that he has an adequate remedy at law in the form of an action for compensatory damages. This defense was urged by a Motion to Dismiss, which motion was referred to the merits.

(2) The public works statute is not mandatory and the Board is vested with wide discretion to determine the lowest responsible bidder, and this determination, if made in good faith, is final and binding and should not be disturbed by the courts.

(3) That Marco, rather than plaintiff, is the lowest responsible bidder who bid according to the contract, plans and specifications, as advertised.

(4) That under the public works statute and the bid documents, defendants reserved the right to reject any and all bids. Therefore, it could, in the exercise of its discretion, reject plaintiff's bid.

### Plaintiff's Right of Action

■ It is the established jurisprudence of Louisiana that an unsuccessful bidder on a contract advertised by a public board to be let to the lowest responsible bidder may sue to set aside the award.[35] The motion to dismiss is accordingly denied. It should be noted that this case has been tried on its merits and a specific request has been made not only for permanent injunctive relief, but also for a decree declaring the contract to be null and void.

### The Important Issues Involved

This litigation involves serious issues which are fundamental to the proper administration by public officials of public contracts. The issues presented here are of great importance to the public, in general, and the construction industry in particular. The pivotal questions are:

(a) Do the public works statutes, heretofore set forth, permit the rejection of the lowest responsible bidder who has bid on public work according to the contract documents, and the award of the contract to a higher bidder?

(b) Is the action of the Board in rejecting Pittman's bid and accepting Marco's so patently illegal under the total circumstances here that the Court must set it aside, even though it was entered into in good faith?

As posed, these questions embrace incidental issues as to (1) whether plaintiff is a responsible bidder; (2) whether plaintiff bid according to the plans and specifications; (3) how is the responsibility of the bidder to be determined; and (4) what is the line of distinction between "arbitrary" conduct on the part of public body and that conduct which can merely be said to be erroneous, and (5) what discretion does the Board have?

### The Nature and Purpose of the Public Works Statute.

■ The public works statute, supra, which provides for the proper letting of public contracts for public work, is, in the words of the Louisiana Supreme Court:[36]

"a prohibitory law founded on public policy * * *. A contract made in violation of that statutory requirement is wholly illegal." * *

An analysis of the statute reveals its evident object and purpose. The intent

---

35. State ex rel. Bank of Franklinton v. Louisiana State Board of Agriculture, 122 La. 677, 48 So. 148; Bienvenu v. Police Jury, 126 La. 1103, 53 So. 362; State ex rel. First Nat. Bank of Shreveport v. Police Jury, 142 La. 691, 77 So. 503; Sternberg v. Board of Commissioners, 159 La. 360, 105 So. 372; St. Landry Lumber Company v. Mayor, 155 La. 892, 99 So. 687; Standard Highway Company v. Police Jury, 158 La. 294, 103 So. 819.

36. Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18.

and meaning are clear. The words are distinct. Expressed in terms of positive command, the statute is a mandate that all public work must be let to the lowest responsible bidder; that no public work may be done except as provided therein; and that any contract let in violation of the statute is null and void. The lowest responsible bidder's position is not one of grace; it is one of right. Such a status cannot be lightly disturbed.

 The word "shall", which is employed throughout the statute, is mandatory, as distinguished from "may", which is merely permissive.[37] When the words and phrases of the statute are read with their context, and construed according to their common usage (as must be done), it is clear that the Board had very limited discretion in its determination of the lowest responsible bidder.[38]

The public interest requires the encouragement of contractors to submit bids for public improvements. Numerous bidders create competition. Competition lowers costs. If bids are rejected on hearsay evidence and without legal cause, contractors will not take the time and money necessary to submit bids. Favoritism will be inferred. Local pressures will be exerted and encouraged by prospective sub-contractors and others. The door would be open to fraud and collusion. What is struck at in the prohibition of the awards to any but the lowest responsible bidder is not any actual evil in a given instance, but the recognized abuses which such an award might tend to encourage. The Court hastens to add that here there is no charge of fraud or collusion and there was none. Here, the Board acted in good faith.

The nature of the statute is illustrated by Sternberg v. Board of Commissioners, 159 La. 360, 105 So. 372, 373 in which the Louisiana Supreme Court affirmed judgment of the lower court in favor of plaintiff (the lowest bidder) enjoining the award of a construction contract to a higher bidder as being in violation of Act 249 of 1924:[39]

"The case is clearly with the plaintiff on the merits. Section 2 of Act 249 provides that drainage and other public boards 'shall meet at the time and place set and in open session shall receive, open and read all bids and shall then and there award said bids to the lowest possible bidder, provided they shall have the right to reject any and all bids and proposals and readvertise for same.' This section makes it the mandatory duty of a public board, at the times the bids are opened, 'then and there to award said bid to the lowest possible bidder.'

"The only alternative that a public board has under the statute is to reject any and all bids and readvertise for same.

"Notwithstanding the right to reject, the bid must be awarded in competition to the lowest possible bidder, if awarded at all."

Another apt illustration is furnished by Standard Highway Company v. Police Jury, in which the Supreme Court again upheld a judgment annulling a contract awarded to a higher bidder. There, the Court said [158 La. 294, 103 So. 821]:

"The statute means that the lowest bidder must have the contract, if he be a responsible bidder, even though he be not the most responsible of the bidders."

There, the board had rejected the lowest bid for gravel in good faith and awarded the contract to next lowest bidder on basis that such bidder to their knowledge would furnish a better grade of gravel.

37. LSA–R.S. 1:3.

38. The word "shall" is ordinarily imperative, of similar effect and import with the word "must", and inconsistent with the idea of discretion. 82 C.J.S. Statutes § 380, pages 877–882.

39. This public works act, which was superseded by our present law (Act 73 of 1926) now LSA–R.S. 38:2211–38:2217), required the contract to be let to the "lowest possible bidder."

In Fourmy v. Town of Franklin, 126 La. 151, 52 So. 249, the Supreme Court affirmed the judgment of the trial court, which annulled a contract of the city council to the third lowest bidder. There, the council made the award in secret session and the only explanation for the action was that one of the councilmen was told that the low bidder was a crook.

The legal principles applicable here were to some degree discussed in St. Landry Lumber Company v. Mayor & Board, 155 La. 892, 99 So. 687, 690. There, the Supreme Court made it clear that the discretion of a public board in cases of this nature was limited and subject to judicial review. With reference to the contention of defendants that the Board was vested with wide discretion to determine the lowest responsible bid, the Court stated:

"We agree with counsel for defendant that the responsibility of the bidder is to be determined, not alone by his financial ability to perform the work, but that his experience and reputation for satisfactory work are of equal importance."

A careful reading of the Louisiana statute and the Louisiana cases reveal a clear cut picture. The courts have been consistent in enforcing compliance with the mandatory provisions of Louisiana's strong but plainly worded statute. Other states have similar statutes. None have stronger statutes, with the possible exception of New Jersey. There has, of course, been much litigation concerning the contruction and application of statutory provisions in other states relating to the letting of contracts to the lowest responsible bidder and the discretion which may be exercised by the letting authorities. Counsel for both sides have, in extensive briefs, reviewed this jurisprudence. The state courts in some states, such as Colorado, have held that the Boards have broad discretion, but in other states, such as New Jersey, the discretion is very limited. From these cases it is difficult to state a given rule to determine the issue in Louisiana and this is because the statutes differ, and from the confusion caused by the unqualified statement of rules which are properly limited to the application of particular statutes and circumstances.

However, we conclude that the Louisiana statute is a prohibitory law founded on public policy, and any contract made in violation of that statutory requirement is wholly illegal. Accordingly, the statute does not permit the rejection of the lowest responsible bidder who has bid on public work according to the contract documents and the award of the contract to a higher bidder; and further, that there is a discretion vested in the Board to determine who are and who are not responsible bidders, but that that determination must not only be honest and sincere but in addition it must be based on sound and good evidence and the same standards should be applied by the Board equally to all bidders. The responsibility of the bidder is to be determined not alone by his financial ability to perform the work, but his experience and reputation for satisfactory work of equal importance.

Counsel for each side have ably and extensively briefed the evidence and the testimony (covering 1,064 pages). The hearing was, with the consent of all parties, converted to a trial on the merits for permanent injunctive and other relief.

The Court, considering the pleadings, the evidence, the arguments, and the briefs, now proceeds to make specific findings as follows:

### Findings of Fact

(1) Plaintiff (Pittman Construction Co., Inc.) is a corporation organized and existing under the laws of Delaware. Defendant (the Housing Authority of the City of Opelousas) is a public corporation, organized and existing under the laws of Louisiana (LSA–R.S. 40:381 et seq., formerly Act 275 of 1936, the "Housing Authorities Law").

(2) The matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

(3) In April, 1958, defendant (acting through the Board of Commissioners,

herein called the "Board") published advertisements, including an invitation for bids, for construction in the City of Opelousas of a low-rent housing project to consist of 140 dwelling units. This project is to be constructed and operated by defendant (under authority of the Housing Authorities Law, LSA–R.S. 40:381 et seq., Act 275 of 1936) in cooperation with the Public Housing Administration (herein called "PHA") under the federal housing act (42 U.S.C.A. §§ 1401–1433). The project is to be financed by PHA and defendant on a joint contribution basis under the terms of an "annual contributions" contract. PHA shall advance federal funds (up to 90%) under a prescribed loan arrangement. The balance is to be constributed by defendant out of proceeds from the sale of its own bonds. In contemplation, the PHA loan shall be repaid out of proceeds from defendant's bonds, which are payable out of rents to be received from tenants of the project.

(4) The advertisement for bids specified that defendant would receive and open the bids on May 8, 1958. However, this date was later postponed by the Board to May 22, 1958 at the request of H. J. Danel, who, as President of Danel-Ryder, Inc. (a general contractor), was interested in bidding on the work, and another unidentified prospective bidder.

(5) On May 22, 1958, the Board met, and opened and read aloud the nine bids which had been received. The four lowest bids were as follows:

| | |
|---|---|
| 1 — Danel-Ryder, Inc. | $1,112,500 |
| 2 — Pittman Construction Co., Inc. (plaintiff herein) | $1,169,000 |
| 3 — Marco Construction Company | $1,169,118 |
| 4 — Wohfield Construction Company | $1,172,500 |

(6) The Board then went into executive session and passed a resolution to award the contract to Danel-Ryder, Inc., subject to PHA approval, which was a condition precedent to such award.

(7) PHA refused to accept the Board's recommendation on the ground that Danel-Ryder, Inc. was an ineligible bidder because H. J. Danel (president and major stockholder of the company) had been a member of the Board until March 7, 1958. PHA's rejection was expressed in a telegram (dated May 28, 1958) from Marshall W. Amis (the PHA Regional Director) to the Board.

(8) The bid documents and the annual contributions contract between defendant and PHA contained provisions which prohibited any member of the Board of a local housing authority (such as defendant), or any one who had been a member of such Board, from acquiring any interest (direct or indirect) in any such construction contract within one year from the date on which such person ceased to be a member of the Board.

(9) The members of the Board, who were elated that Danel-Ryder, Inc. (a local firm) was the low bidder and, therefore, might receive the contract, were very disappointed because of PHA's ruling that Danel-Ryder, Inc. was ineligible.

(10) The Board wanted to start over and throw out all bids when they received the PHA telegram denying a waiver to Danel. (Tr. 994).

(11) In the telegram, PHA requested the Board to "submit promptly your formal recommendations of an award to an eligible bidder."

(12) When the bid ($1,112,500) of Danel-Ryder, Inc. was rejected, plaintiff's bid ($1,169,000) became lowest. The next low bid was that of Marco Construction Company ($1,169,118).

(13) When the Board received PHA's telegram of May 28, 1958, the Chairman

(John D. Edwards), acting through the Executive Director (Yorick Chachere), requested plaintiff to have a representative attend a meeting of the Board scheduled for the evening of June 2, 1958.

(14) T. A. Pittman did not seek to have Danel-Ryder withdraw its bid.

(15) On the morning of June 2, 1958, some of the Board members met with Congressman T. A. Thompson, among others, for the purpose of discussing the situation. The members of the Board did not feel that Congressman Thompson had put forth his best effort to obtain PHA's approval of Danel-Ryder, Inc., and they (particularly the Chairman) expressed keen dissatisfaction toward him.

(16) H. J. Danel was one of the original members of the Board. His membership was continuous until early 1958, his resignation being effective on March 7, 1958.

(17) H. J. Danel is a prominent and highly respected citizen of Opelousas. He enjoys an excellent reputation as a general contractor. He is a close friend of the Board members. He has done nothing wrong.

(18) This low-rent housing development is one of the largest (if not the largest) construction projects ever undertaken in that community.

(19) Subsequent to PHA's rejection of Danel-Ryder, Inc., the project became very controversial. Plaintiff, through no fault of its own, was considered an adversary of Danel-Ryder, Inc. (a local firm) in a "contest" over the contract.

(20) The situation became a topic of discussion on the streets of Opelousas. Gossip and rumors were prevalent. Later, an editorial appeared in the local paper entitled "The Boys are in a Dilemma."

(21) At a meeting on the morning of June 2, 1958, Congressman Thompson expressed concern that defendant might lose the appropriation of federal funds for the project if the contract were not awarded to the lowest responsible bidder.

(22) At the same meeting, the attorney (Honorable Robert F. DeJean, City Judge of Opelousas) for Marco Construction Company (intervenor herein) informed the Board of charges about unreliability (or irresponsibility) of plaintiff, which had been brought to his attention. He requested that the Board postpone the award of the contract, and thus afford him the opportunity to investigate plaintiff and develop the information against it.

(23) The Board, in effect, granted this request by assuring Marco's attorney that it would not award the contract before the next Friday (June 6, 1958).

(24) The Board members were in a quandry. The Court feels that they would have liked to have rejected all bids, and readvertise and re-let the contract after the bid of Danel-Ryder, Inc. was rejected. Local people were naturally for the local man. Mr. Thistlethwaite quoted Mr. Edwards, the very able and frankly honest chairman of the Board, as saying that he "thought the ultimate result of them filing that injunction, or filing the suit, would be that everybody would be thrown out and they could start all over." (Tr. 1005).

(25) In response to the Board's request, Albert E. Pittman (Secretary-Treasurer of plaintiff) attended the meeting on the evening of June 2, 1958. He was examined thoroughly by the Board with reference to plaintiff's construction experience, and particularly about: (a) the Desire Street Housing project, which Pittman Construction Company (a partnership composed of Theodore A. Pittman and Albert E. Pittman) had constructed for the Housing Authority of New Orleans (herein called "HANO"); (b) the lawsuit between the Pittman partnership and HANO that arose out of that project; and (c) the payment by the Pittman partnership of subcontractors on, and furnishers of material for use in, that project.

(26) At this meeting, Albert E. Pittman answered all questions put to him, and furnished all information requested of him, by the Board. He expressed a complete willingness to execute an affidavit as to the truth of all statements

made by him, and to make a full disclosure of any other information the Board might want.

(27) On June 4, 1958, John D. Edwards (Chairman of the Board) communicated by telephone with Marshall W. Amis (PHA Regional Director). They discussed the situation in general and plaintiff's bid in particular. In response to a specific inquiry from Edwards as to whether plaintiff would be acceptable as the contractor, Amis advised him that plaintiff was acceptable. This oral advice was confirmed by a telegram to the Board of the same date, in which Amis stated "If the Housing Authority of Opelousas recommends an award to Pittman Construction Company, we will aprove it."

(28) On June 6, 1958, the Board, at a special meeting, received evidence presented against plaintiff by Robert F. DeJean, as attorney for Marco (the next low bidder).

(29) The evidence consisted of (a) an ex parte affidavit from one Elmore Labiche (a plumbing subcontractor for the Pittman partnership on the Desire Street Housing project), which expressed an unwillingness to work for the Pittmans; (b) copies of some of the pleadings filed in the Pittman-HANO litigation; and (c) other hearsay testimony.

(30) Immediately, the Board passed a resolution declaring Marco to be the lowest responsible bidder, and recommending to PHA that the contract be awarded to Marco.

(31) Plaintiff had not been requested to attend, and was without knowledge of, this meeting. Nor were any of plaintiff's personnel informed of the Labiche affidavit, or the contents thereof, or the unfavorable rumors reported to certain Board members. Later they were so informed.

(32) Plaintiff's personnel were not afforded any opportunity to confront any of the person who reported these rumors to Board members, nor permitted to present evidence to refute the charges made against them, until after the rejection of plaintiff's bid.

(33) Pittman did not refuse to furnish any information requested of him.

(34) On the next day (Saturday, June 7, 1958), Albert E. Pittman learned of the action taken by the Board on the night before. Immediately, he sent a telegram to each Board member protesting the award of the contract to Marco, insisting that the contract be awarded to plaintiff, as the lowest responsible bidder, in accordance with law, and requesting a statement of the Board's position.

(35) The Board made no reply to, and ignored, plaintiff's protest, but proceeded to recommend to PHA (by letter dated June 9, 1958) that the contract be awarded to Marco.

(36) PHA withheld action on the Board's recommendation until June 24 or 25, 1958, when it finally approved the Board's award of the contract to Marco.

(37) During the interim, plaintiff engaged the law firm of Deutsch, Kerrigan & Stiles, and Gerald J. Gallinghouse of that firm sent a telegram on June 19, 1958 to the Chairman of the Board, with a copy to each member, requesting a meeting with the Board on the next day.

(38) The Board did not reply to this telegram, but Gallinghouse, with Theodore A. Pittman (President of the plaintiff company) and Albert E. Pittman (Secretary-Treasurer) went to Opelousas on that date (June 20, 1958).

(39) At the request of Gallinghouse, Chairman Edwards and two members of the Board (Carron and McCormick) met with him and the Pittmans in the afternoon of that date. Others in attendance were Yorick Chachere (Executive Director for the Board), Harry B. Garland (attorney for the Board), Robert F. DeJean (attorney for Marco), Gilford Cortez (a contractor), and Hugh W. Thistlethwaite (General Manager of, and reporter for, the Opelousas Daily World newspaper).

(40) There was a long and thorough discussion of the plaintiff firm, the Pittmans, and the Pittman partnership, with special emphasis on the Desire Street

Housing project and the resulting litigation.

(41) For the first time, the Pittmans were informed about the contents of the Labiche affidavit, and that the Board had questions about plaintiff's bid form.

(42) The Pittmans and Gallinghouse presented a full explanation of the disputes between the Pittman partnership and HANO and expressed a complete and ready willingness to furnish the Board with any additional information that the Board might want.

(43) As to the exact words used by Mr. Gallinghouse and Mr. Edwards at this meeting, there is a conflict. The Court appreciates the difficulty of recalling one's exact words in an instance of this nature. We accept the testimony of Mr. Thistlethwaite, who is general manager of the Opelousas Daily World and who holds a degree from L. S. U. in mechanical engineering. He attended the June 20th meeting for the purpose of observing and reporting on a matter of public interest. When told by Mr. Edwards that he might be called on to testify, he saved the detailed pencilled notes which he made during the meeting and from which he testified.

(44) The Pittmans did not refuse to obtain such affidavits, as unfair and unreasonable as was this suggestion. In fact, they (through their attorney) expressed themselves as willing to do even this if the Board would agree to withhold execution of the contract with Marco while they endeavored to obtain the affidavits. The Board (speaking through Chairman Edwards) positively refused to do this. Mr. Edwards stated "the only way you will get the job is if the Public Housing Authority won't okay Marquette. If Fort Worth turns down Marquette, we may be forced to work with Pittman." (Tr. 998). The Board would not agree to withhold execution of the contract while affidavits were being procured. (Tr. 999, lines 6–15).

(45) This proceeding was commenced on June 25, 1958, when plaintiff obtained an order requiring defendant and the Board members to show cause on July 7, 1958 why injunctive relief should not be granted.

(46) On the same date, the Board (acting through Yorick Chachere, its Executive Director) signed the contract with Marco. Soon thereafter work was begun. As of the time the case was tried, only one subcontract had been executed. This was for the clearing of the site.

(47) When plaintiff discovered that the contract had been signed, it filed an amending complaint to recite the events that occurred subsequent to the commencement of this action. The hearing was held thereafter and with consent of all parties was converted to a trial on the merits for a permanent injunction and other incidental relief.

(48) Plaintiff is a responsible contractor. It is one of the largest general contractors in the State of Louisiana, and in general, enjoys an excellent reputation. The officers of the plaintiff company have had extensive experience in the construction industry. They appear to have specialized in large public works projects. A partial list of the construction projects completed successfully by them (over a period of time going back to 1932) aggregate some $68 million. They have the organization, equipment and technical experience to perform such work. Their financial resources are exceptionally good, as demonstrated by their ability to obtain $15 million in performance bonds. The Pittmans are prompt in payment of their obligations to subcontractors and furnishers of material. There can be no doubt of plaintiff's competence and ability to fulfill efficiently and economically the obligations imposed on the contractor by the subject contract documents. And, too, the records show that the Pittmans are considered to be able businessmen of high integrity. The financial report of the Pittman Corporation shows that the firm has multimillion dollar resources. The company is in good standing with AGC. Plaintiff has a "Triple A" rating in Dun and Bradstreet (Tr. 184). In this area at the present time, Pittman is

building a U. S. Post Office at Lafayette, and a large Public Housing project in Lake Charles.

(49) Plaintiff's bid complied in all material respects with the contract documents as advertised. The "defects" in the bid which the Board refers to as "irregularities" are harmless. No advantage or benefit could possibly have been derived by plaintiff therefrom. Nor was the competitive character of plaintiff's bid affected thereby.

(50) A comparison of the bids submitted by plaintiff and Marco reveals that the latter bid contained omissions similar to, if not more serious than, those in plaintiff's bid, but the Board did not consider these to be important or objectionable.

(51) The litigation between the Pittman partnership and HANO in connection with the Desire Street Housing project involves bona fide disputes and does not cast an unfavorable reflection on the Pittmans in any way. HANO offered $493,000 to the Pittmans within six weeks before this trial commenced in settlement of this lawsuit. PHA did not consider this litigation to be any evidence of irresponsibility on the part of the Pittmans. In December, 1957, PHA approved the award to plaintiff of a contract for the construction of a similar project by the Lake Charles Housing Authority. Moreover, PHA invited plaintiff to submit a bid on the subject project. PHA (acting through Amis, the Regional Director, and a fine public official) expressed approval of plaintiff as an eligible and responsible contractor in its telegram of June 4, 1958. Herbert Manning, as the attorney for the PHA Regional Office in Fort Worth, and Amis, as the Regional Director, had full knowledge of the Desire Street Housing project, and the Pittman-HANO litigation, and neither one of them considered the Pittmans to be irresponsible.

(52) The Board's determination that plaintiff was not the lowest bidder was not the exercise of sound discretion. The action was not based on good, reason-able and sufficient reasons, nor is the decision sustained by the evidence.

(53) The Board's preference of Marco's higher bid over plaintiff's bid was unreasonable under the total circumstances here.

(54) No member of the Board was guilty of fraud or corruption.

(55) No member of the Board acted in collusion with Marco.

(56) No member of the Board had any wrongful intent.

(57) On the contrary, the Board acted in good faith and so did Marco.

(58) Plaintiff will suffer permanent and irreparable injury for which it has no adequate remedy at law as a result of defendant's action if this award is not declared null and void, because Pittman will have been placed in a position whereby any bid that he might in the future make could be completely ignored and disregarded by any public body in Louisiana. This would be highly inequitable and would remove from the public works contracting field one of the most active, able and financially responsible competitors in Louisiana.

(59) The City of Opelousas will not lose the appropriation of federal funds for the subject project if the contract between defendant and Marco is declared null and void. The project will be constructed whatever may be the decision of the court herein with reference to the Board's action. An equitable settlement will be made between defendant (with PHA approval) and Marco.

(60) The Housing Authority Board had the specific right to reject any and all bids, and while this court has the authority to declare the contract null and void, it does not have the authority to compel the Housing Board to award the contract to any particular bidder. The Housing Authority had the choice, under the totality of circumstances here, to make the award to Pittman or to make it to no one. They still have that choice.

Conclusions of Law

(1) The Court has jurisdiction of this action. (28 U.S.C. § 1332).

(2) The law of Louisiana (statutes and decisions) provide the rule of decision.

(3) The subject project is "public work" to be done by a "public corporation" and must be advertised and let by contract to the lowest responsible bidder who has bid according to the contract, plans and specifications as advertised in accordance with the provisions of the public works statute (LSA–R.S. 38:2211 et seq., formerly Act 73 of 1926, as amended).

(4) Plaintiff was the lowest responsible bidder who bid according to the contract, plans and specifications.

(5) The public works statute is a prohibitory law founded on public policy.

(6) A contract entered into for the construction of public work contrary to the provisions of the statute is null and void.

(7) Marco was not the lowest responsible bidder who bid according to the contract, plans and specifications as advertised.

(8) The Board was vested with some discretion to determine whether plaintiff was a responsible bidder, but their determination was not the exercise of a sound discretion, as required by law. The Board's determination was not based on good, reasonable and sufficient reasons nor sustained by the evidence. The Board's action, which is subject to judicial review, was unreasonable and must be set aside. Discretion cannot operate in a void, but only upon facts which are material to the matter under consideration.

(9) Plaintiff, as an unsuccessful low bidder on a contract for public work, which, under law, should have been let to the lowest responsible bidder, was entitled to sue to enjoin the award of the contract to Marco, and to annul the contract.

(10) Plaintiff will suffer permanent and irreparable injury, for which it has no adequate remedy at law, as a result of defendant's action in: (a) declaring that plaintiff was not the lowest responsible bidder; (b) refusing to award the contract to plaintiff, if that award is permitted to stand.

(11) The contract entered into by defendant and Marco under date of June 25, 1958 is in violation of the public works statute, and therefore, is null and void.

(12) The Board had the right to reject all bids.

### Relief Which Should Be Granted Pursuant to the "Findings" and "Conclusions"

The original complaint asks that the Opelousas Housing Authority be enjoined from awarding and executing the contract in question with anyone but plaintiff. The contract to Marco was executed on June 25th, prior to the service of process on defendant. Accordingly, this demand has become moot and is stricken.

Heretofore, the Court has found that plaintiff would suffer irreparable injury if the contract were to stand. The irreparable injury would be that if the contract stands, Pittman's future bids on public projects in Louisiana could legally be completely ignored. Such a result is corrected by a simple decree of this court declaring the subject contract null and void. This court will not compel a public body to award a contract to a bidder not chosen by that body and especially is that true in this case where the right to reject all bids is specifically reserved under the law and in the bid documents. The Housing Authority under the law is to award the contract to the lowest responsible bidder or reject all bids and readvertise for bids.

Accordingly, it is ordered, adjudged and decreed that there be judgment in favor of plaintiff, Pittman Construction Company, Inc., and against the defendant, the Housing Authority of the City of Opelousas, and against the intervenor, George G. Marquette, Jr., d/b/a Marco Construction Company, declaring that the contract executed by defendant, the Housing Authority of Opelousas, and defendant-intervenor, George G. Marquette, Jr., d/b/a Marco Construction

Company, under date of June 25, 1958, for the construction of the low rent housing project consisting of 140 dwelling units (designated LA 55–1) be, and it is hereby, declared to be null and void.