IN THE MATTER OF THE APPLICATION OF AIR
TERMINAL SERVICES, INC., A VIRGINIA
CORPORATION, PETITIONER, FOR A WRIT OF
MANDAMUS DIRECTED TO FUJIO MATSUDA,
DIRECTOR OF TRANSPORTATION OF THE
STATE OF HAWAII.

IN THE MATTER OF THE APPLICATION OF
ELLEN LOWE SHAM, ON BEHALF OF HER-
SELF, ALL THE TAXPAYERS OF THE STATE
OF HAWAII AND ALL MEMBERS OF THE PUB-
LIC AT LARGE WHO UTILIZE AIR TRANSPOR-
TATION WITHIN THE STATE OF HAWAII, FOR
A WRIT OF MANDAMUS DIRECTED TO FUJIO
MATSUDA, DIRECTOR OF TRANSPORTATION
OF THE STATE OF HAWAII.

No. 4287.

MAY 27, 1964.

TSUKIYAMA, C.J., CASSIDY, WIRTZ,
LEWIS AND MIZUHA, JJ.

500

OPINION OF THE COURT BY LEWIS, J.

In the court below two actions were brought, one by an unsuccessful bidder for the contract here involved, and the other by a taxpayer. The unsuccessful bidder, Air Terminal Services, is a foreign corporation and not a taxpayer of this State.

The contract was for installing, equipping and operating the food and beverage facilities concession at the new Honolulu International Airport terminal facilities. The successful bidder was Interstate Hosts, Inc., a Delaware corporation authorized to do business in this State. The contract was let by Hawaii Aeronautics Commission, hereinafter referred to as the "Commission." The date of ex-

ecution of the contract does not appear, but it was pursuant to a resolution awarding the contract adopted by the Commission on November 10, 1960.[1]

Pursuant to section 26 of the Hawaii State Government Reorganization Act of 1959 (Act 1, 2d Sp. S.L. 1959, section 26, R.L.H. 1955, 1963 Supp. § 14A-25) the Commission was abolished July 1, 1961. The Director of Transportation, to whom the Commission's functions were transferred, was substituted before trial.

The actions were consolidated for trial and at the conclusion thereof judgment was entered in each suit in favor of the Director of Transportation. The unsuccessful bidder and the taxpayer have appealed.

Nothing is involved except the scope of discretion on the part of the Commission which awarded the contract. All allegations of fraud and collusion have been stricken from the pleadings by order of the court, and no error is assigned in that regard. The court found after trial that:

"* * * [T]he Respondent members of the Hawaii Aeronautics Commission acted in good faith and in the

[1] The resolution read:

"WHEREAS, bid proposals to install, equip, and operate the food and beverage facilities concession at the new Honolulu International Airport terminal facilities were duly advertised for and thereafter opened on September 15, 1960; and

"WHEREAS, the bidders for such concession were Air Terminal Services, Inc., Dobbs Houses, Inc., International Airport Enterprises, Inc., and Interstate Hosts, Inc.; and

"WHEREAS, the Hawaii Aeronautics Commission has duly investigated, examined into, and considered the skill, business judgment, experience, previous conduct under other contracts, quality of previous work, financial responsibility, and all other matters relating to the qualifications and bids of each bidder; and

"WHEREAS, the Hawaii Aeronautics Commission has determined that in view of all the circumstances the highest responsible bidder for the subject concession is INTERSTATE HOSTS, INC.;

"NOW, THEREFORE, It is hereby resolved that the bid proposal to install, equip, and operate the food and beverage concession at the new Honolulu International Airport terminal facilities be awarded to INTERSTATE HOSTS, INC., and that the bid proposals of the other bidders be rejected."

exercise of an honest judgment that such actions and determinations were in the public interest. No facts were found * * * to show that the Respondents' actions and determinations were the result of any fraudulent or otherwise corrupt motive * * *."

Each complaint,[2] as amended, contained three causes of action. The first cause of action alleged that it was the "plain legal duty" of the Commission to award the contract to Air Terminal Services, Inc. Pursuant thereto, there was a prayer that a writ of mandamus issue directed to the defending officer, "compelling and commanding" him to "forthwith accept the bid proposal of Air Terminal Services, Inc. * * *." The second cause of action alleged that Air Terminal Services' bid was the highest, and that any determination to the contrary would constitute an abuse of discretion. There was a prayer of the complaint that defendant be commanded "to forthwith exercise in good faith any discretion that may be vested in [him] to determine which among the bidders is the highest responsible bidder * * *."[3] The last cause of action, designated the fourth,[4] alleged that the specifications were fatally defective, and that any award based thereon was void. The relief prayed for, if the specifications should be found void, was the rejection of all bids. But read with the allegations of the complaint that the contract had been awarded to Interstate Hosts, what was sought in this connection was really the cancellation of the award. Such cancellation also

---

[2] The complaint in each action was styled "Petition for Writ of Mandamus," and entitled as above set forth. In the trial court the terminology "petition," "petitioner," "respondent," was used. However, we prefer the terminology "complaint," "plaintiff," "defendant."

[3] As will be seen, under the complaint as finally amended this prayer was directed only to such dicretionary authority as might remain to determine which was the *highest* bid.

[4] The third cause of action was deleted upon the commencement of the trial.

was a necessary incident to the relief sought by the other two prayers.

Interstate Hosts was made a party defendant but filed a motion to dismiss under H.R.C.P., Rule 12, "for the reason that the Petition does not request relief against this respondent and could not request such relief under the facts alleged in the Petition." Neither the plaintiffs nor the Commission, then the defendant, made any objection to the dismissal of this party. According to the minutes of February 15, 1961, the attorney for the plaintiffs "submitted to the ruling of the Court and asked leave to amend the petition." At the same hearing there was argued a motion to dismiss which had been filed by defendant Commission prior to that of Interstate Hosts, contending that the complaint in each action failed to state a claim upon which relief could be granted, and specifically contending in the taxpayer's action, *inter alia,* that "even assuming Petitioner [taxpayer] to be a proper party having a proper interest to bring a taxpayer's class action to challenge the bid award of a public contract,[5] mandamus is an extraordinary remedy, and the Petitioner's proper relief is injunctive." By order of February 20, 1961, the defendant Commission's motion was denied but that of Interstate Hosts was granted with leave to amend "to allege facts sufficient to justify a claim for relief as against Respondent Interstate Hosts, Inc." No amendment was made within the time allowed. Interstate Hosts thereafter was dismissed "with prejudice," the order in each case reciting that plaintiff "does not intend" to amend the complaint, and that "it is necessary that the record in the above-entitled case show the termination of the claim by Petitioner against Respondent Interstate Hosts, Inc." The

[5] Defendant subsequently, by answer, denied the allegations of the complaint having to do with the alleged pecuniary injury to taxpayers.

order was approved as to form by plaintiffs' attorney.

## Air Terminal Services' Suit

First attention will be given to the suit brought by the unsuccessful bidder, Air Terminal Services.[6] That suit presented only the first and second causes of action. There could be no justiciable interest in the last cause of action on the part of the unsuccessful bidder, since the invalidity of the specifications would mean that the unsuccessful bidder could take nothing by the suit. *Marshall* v. *Bigelow,* 29 Haw. 641, 653.[7] Distinguishable is the holding in *Marshall* v. *Bigelow,* 29 Haw. 48, that an action could be maintained to compel the letting of the contract when all of the bids had been arbitrarily and capriciously rejected.[8] Distinguishable also is *Brown* v. *City of Phoenix,* 77 Ariz. 358, 272 P.2d 358, in which upon suit of an unsuccessful bidder an arbitrary award of a contract was rescinded as an incident to an award of the contract to the plaintiff, mandated by the court.

The defending officer contended, as set out in the pre-trial order, and still contends:

"Granting of mandamus is within the sole discretion of the Court and should be denied where * * * the contract with the successful bidder has not only been executed but very substantial part performance has been undertaken thereby, and the public would be greatly damaged by the granting of the relief prayed for."

---

[6] "Plaintiff" as hereafter used refers to Air Terminal Services, until we turn to consideration of the taxpayer's suit.

[7] Where it is alleged that the officer in charge has handled the letting of the contract in such a way as to make it unlawful to let the contract at all, an unsuccessful bidder has only such standing as he has as a taxpayer. *Munoz* v. *Commissioner of Public Lands,* 40 Haw. 675; *cf., Wilson* v. *Lord-Young Engineering Co.,* 21 Haw. 87. In this instance the unsuccessful bidder is not a taxpayer.

[8] Upon trial of the case, it developed that the rejection of the bids had reasonable basis. *Marshall* v. *Bigelow, supra.* 29 Haw. 641.

Plaintiff argues that under the Hawaii Rules of Civil Procedure this should not be regarded as solely a mandamus action and any relief supported by the evidence should be granted, including injunctive relief. This argument overlooks the fact that Interstate Hosts was dismissed *with prejudice* on the specific ground that the complaint stated no claim for relief as against it.

The dismissal of Interstate Hosts was on the basis that this was a mandamus suit and there was no duty to be performed on the part of Interstate Hosts. Plaintiff agrees with this analysis, arguing that: "The basis of the dismissal of Interstate Hosts as a party respondent was on the ground that it was an action directed against the public officials and that relief was not being asked against Interstate Hosts." What plaintiff fails to recognize is that by virtue of this dismissal, which we again note was "with prejudice," it became the law of this case that the action was strictly a mandamus action. Since no amendment was made and no injunctive relief was sought, though opportunity was given to state a claim for relief against Interstate Hosts, plaintiff must live with the case as framed by it and is subject to the rule that in the exercise of sound judicial discretion, a court should not grant a writ of mandamus where the public contract involved has not only been awarded but actually executed, at least when there has been part performance on the part of the successful bidder, who is in possession.

It has been said that it is enough to defeat mandamus that the contract has been executed. *Detroit Free Press Co.* v. *Board of State Auditors,* 47 Mich. 135, 144, 10 N.W. 171, 175; *Capital Printing Co.* v. *Hoey,* 124 N.C. 767, 33 S.E. 160, 168; *State ex rel. Phelan* v. *Board of Education of the City of Fond Du Lac,* 24 Wis. 683; *Butler* v. *Darst,* 68 W. Va. 493, 70 S.E. 119, 121, *overruled on another point,*

*State ex rel. Printing-Litho, Inc.* v. *Wilson,* 128 S.E.2d 449 (W. Va.). But we need not go that far, as there are additional circumstances here.

At the trial it appeared that work under the contract on the part of Interstate Hosts had proceeded to the point where the restaurant in the Inter-Island Terminal was in operation and work on the restaurant in the Overseas Terminal was in the planning stages. Interstate Hosts had expended under the contract "Roughly around $250,000," found by the trial court to be "in excess of $200,000." These figures represent the expenditures up to the time the testimony was given, which was July 25, 1961.[9] On July 28, 1961 the court below rendered its decision in favor of defendant. Findings of fact and conclusions of law were filed and judgment entered on August 24, 1961.[10]

This court will take judicial notice of what is common knowledge, namely, that Interstate Hosts now is in full operation under the contract. Upon the argument of the case plaintiff made no objection to the court taking judicial notice of such fact, though arguing it is immaterial. The contract of Interstate Hosts required that it expend $1,120,289.28 for improvements, to be completed by January 1, 1963. It is manifest that after the court below rendered its decision in favor of defendant the main part of the work was done, amounting to an additional investment of $850,000 to $900,000, while plaintiff stood by knowing

---

[9] Specification of Error No. 6 assigns as error the admission of this testimony. At the trial objection was made that it was irrelevant. For reasons which will appear we hold that it was relevant.

[10] Plaintiff's opening brief as appellant was filed March 1, 1962, the answering brief was filed June 29, 1962, and the reply brief on August 9, 1962. This court heard argument upon the opening of the term, October 4, 1962. However, the court found further briefing necessary on certain procedural points. This was ordered December 14, 1962. The further briefing was not completed until August 15, 1963. The court directed that the case be reargued on October 8, 1963, but at the request of plaintiff it was put over to December 3, 1963 when the case was reargued.

that Interstate Hosts had been dismissed on the basis the action was strictly a mandamus action, knowing also the position taken by defendant as to the limited scope of mandamus, and made no move to seek injunctive relief.

This court is unable to ascertain what order or direction could be given in the writ of mandamus that would not be tantamount to relief against Interstate Hosts, which has been dismissed with prejudice. When plaintiff elected mandamus as a remedy and failed to amend, it took the chance that the case would pass beyond the point when a simple direction to the defending officer would serve. As stated in *State ex rel. Prince* v. *Police Jury,* 108 La. 311, 314, 32 So. 363, 364:

> "* * * It [mandamus] will not be granted where it is manifest that it will prove unavailing. Under no circumstances could it be decreed that the one to whom the contract was awarded must vacate and surrender the contract to relators, and without such an order there could be no specific performance, and the mandamus would be a dead failure. The act, the performance of which is asked for, must be legally possible, before the writ issues. In the present suit it is not legally possible. Mandamus was not the remedy. The one to whom the contract was awarded was in possession, and was carrying passengers, luggage, and freight across the river,—a work from which he cannot well be stopped without making him a party; and, as he is not one who can be made a respondent,[11] it only remains for us to sustain the decision of the district court [denying the writ]."

It is true that in the cited case the plaintiff was guilty of laches but the quoted portion of the opinion was an

---

[11] Here, Interstate Hosts cannot be brought back into the case for the purpose of ousting it, since it was dismissed with prejudice.

additional ground, and it very well states the unavailability of mandamus to attack a public contract when the contract has not only been executed but possession has been taken and the concessionaire is operating under it. To issue the writ would be tantamount to relief against Interstate Hosts, which is not possible under the procedure followed in this case.

The availability of the writ is to be judged at the time of its issuance, in the light of the conditions as changed during the pendency of the proceeding, not those which obtained when the mandamus proceeding was started.[12] Thus in *Talbot Paving Co.* v. *Common Council of City of Detroit,* 91 Mich. 262, 51 N.W. 933, the writ was denied on the ground that the contract had been let and the work done during the pendency of the mandamus proceedings.

We cannot agree with plaintiff's contention that, since Interstate Hosts had notice that the award was being contested, the case should be treated the same as an injunction suit and the court should take no cognizance of changes occurring after such notice, which plaintiff would date back to November 21, 1960 when the unsuccessful bidder filed its abortive appeal from the resolution awarding the contract as set out in No. 4231 this day decided. Plaintiff cites *Anderson* v. *W. G. Rawley Co.,* 27 Haw. 150, an injunction suit filed as a companion suit to a mandamus action,[13] in which it was held that the court would take no notice of changes during the pendency of the proceeding

---

[12] No alternative writ of mandamus under R.L.H. 1955, § 236-5, was sought or issued in this case.

[13] See *Anderson* v. *Cain,* 27 Haw. 156 (motion to dismiss writ of error in the mandamus action denied) ; *Same* v. *Same,* 27 Haw. 415 (writ of error in the mandamus action dismissed as moot, along with writ of error in the injunction suit). It is noteworthy that in the mandamus action the court intimated a doubt as to whether the defendant building inspector could be compelled by mandamus to undo his act in granting the building permit which was the subject of the suit. *Anderson* v. *Cain, supra,* 27 Haw. at 157-58.

even though no preliminary injunction was secured. That case is not in point since this was and is strictly and solely a mandamus action.

An effective answer to plaintiff's contention based on notice to Interstate Hosts that the award was being contested is found in *Jefferson Lake Sulphur Co.* v. *Kolb*, 226 La. 506, 76 So. 2d 546. That was a mandamus proceeding in which the defending officers pleaded the pendency of a taxpayer's suit in justification of their refusal to pay a claim which had been judicially recognized in a previous suit, *Jefferson Lake Sulphur Co.* v. *State*, 213 La. 1, 34 So. 2d 331, and for the payment of which the legislature had made an appropriation. In the pending taxpayer's suit the appropriation was attacked as unconstitutional, but no injunctive relief had been granted nor had the claimant been made a party. A writ of mandamus to compel the payment of the claim was granted notwithstanding the pending suit. So here the mere pendency of litigation attacking the award did not relieve the officers in charge of the performance of their duty, or Interstate Hosts of its contract.

Air Terminal Services, as we have noted, has no standing to litigate the question whether any contract at all could be let on the specifications which the Commission put out for bid. Its complaint raised the contention that it was entitled to the award of the contract and the court should command the acceptance of its bid, or at least command the exercise in good faith of any discretion remaining in defendant to determine which was the highest bidder.

What we have said as to the unavailability of mandamus where the performance of the contract has proceeded as far as it has here, in itself disposes of the claims of Air Terminal Services for a writ of mandamus. More-

over, Air Terminal Services could not be granted such writ because of the discretion possessed by the contracting officer, both under the terms of the statute[14] and the call for bids, to reject all bids. Air Terminal Services could not complain that such action would be arbitrary, the work having proceeded too far to enable the contract to be let on the original terms.

We note that in *Housing Authority of the City of Opelousas* v. *Pittman Constr. Co.,* 264 F.2d 695 (5th Cir.), a contract made with one not the lowest (or here, "highest") bidder was declared null and void upon suit of the unsuccessful bidder even though the court could not mandate an award to the plaintiff because of power of the contracting officer to reject all bids. That case arose in Louisiana and was decided under the rule prevailing there. Ordinarily, an injunction or decree preventing or rescinding an award to another is granted an unsuccessful bidder only as an incident to mandatory relief to which the unsuccessful bidder is entitled.[15] Annot., 80 A.L.R. 1382, part III at 1397; *cf., Colorado Paving Co.* v. *Murphy,* 78 Fed. 28, 32 (8th Cir.). In any event, we are not persuaded that the Louisiana rule is applicable under the circumstances of this case. Even if Interstate Hosts had remained in the case we would find persuasive the reasoning of the Ohio court in *State* v. *City of Cleveland,* 102 Ohio App. 306, 129 N.E.2d 521. That case presented a situation similar to that here present—a contract for a concession to sell refreshments in the city parks had been awarded, the contract had been executed, and the awardee of the contract had taken possession. It was held that where a contract

---

[14] See note 24, *infra.*

[15] Clearly distinguishable are review proceedings such as were involved in *Sellito* v. *Township of Cedar Grove,* 132 N.J.L. 29, 38 A.2d 185; *Ward La France Truck Corp.* v. *City of New York,* 7 Misc. 2d 739, 160 N.Y.S.2d 679 (Sp. Term, N.Y. County).

has been executed an unsuccessful bidder has no standing in court, no personal interest in the controversy, in the absence of a clear legal right to be awarded the contract. While the unsuccessful bidder failed in that case because of the right of the contracting authority to reject all bids and on that exact point the case is in conflict with *Housing Authority of the City of Opelousas* v. *Pittman Constr. Co.,* the reasoning of the case is sound and applicable under the circumstances of this case. As will be seen, Air Terminal Services has not shown that it was the clear legal duty of the awarding authority to accept it as a responsible bidder. That was shown in *Housing Authority of the City of Opelousas* v. *Pittman Constr. Co., supra.*

Chief reliance by plaintiff is on the fact that Air Terminal Services outbid Interstate Hosts in respect of the minimum annual guarantees of rent for the ten years (1963-1972) for which a guaranteed rent was required.[16] Against a ten-year guarantee of $4,263,000 Air Terminal Services, had it been awarded the contract, would have posted a performance bond of only $60,167.00,[17] and the

---

[16] Their respective bids were as follows:

|      | Air Terminal Services, Inc. | Interstate Hosts, Inc. |
|------|-----------------------------|------------------------|
| 1963 | $   361,000.00              | $   175,000.00         |
| 1964 | 381,000.00                  | 190,000.00             |
| 1965 | 402,000.00                  | 205,000.00             |
| 1966 | 412,000.00                  | 220,000.00             |
| 1967 | 422,000.00                  | 235,000.00             |
| 1968 | 434,000.00                  | 250,000.00             |
| 1969 | 445,000.00                  | 265,000.00             |
| 1970 | 457,000.00                  | 280,000.00             |
| 1971 | 468,000.00                  | 295,000.00             |
| 1972 | 481,000.00                  | 310,000.00             |
|      | $4,263,000.00               | $2,425,000.00          |

Two other bidders offered $2,140,000 and $1,752,000, respectively, as a ten-year guarantee.

[17] Under the advertised terms and section 9 of the governing statute (Act 245, S.L. 1959, as amended by Act 14, S.L. 1960, and as set out in R.L.H. 1955, 1961 Supp., c. 7B), the performance bond of the awardee of the contract was to be in the amount of two months' rental, computed at one-sixth of the minimum annual guarantee for the year 1963.

question arises: How well assured was this ten-year guarantee of $4,263,000 if Air Terminal Services had over-estimated the financial return from the operation?

· We note that the guaranteed rent offered by Air Terminal Services was well within the projected percentage rentals from that company if computed on the assumption (1) that the food and liquor sales at the new airport terminal would, in relation to the volume of passenger traffic, equal those experienced by the holder of the restaurant concession at the old airport terminal;[18] and (2) that during the ten-year period the food and liquor sales would increase commensurately with the increase in passenger traffic projected in estimates which had been issued by the State. Plaintiff adduced testimony to that effect. A study made by a consultant retained by the Commission showed that "each of the bidders *could* equal or exceed their guaranteed rentals each year, *providing their performance were such as to be comparable with the present operating levels at Honolulu.*" (Underscoring beginning with the word "providing" added—the word "could" was underscored in the consultant's report.) Another study made by the same consultant showed that if, instead of a ratio based on the experience of the holder of the concession at the old airport terminal, the ratio of sales to passengers experienced by Air Terminal Services itself at its operations at Washington, D.C. National Airport, and experienced at St. Louis Lambert Field and Indianapolis Airport by an affiliate or affiliates of Air Terminal Services, were to be used in the computation, then the projected percentage rentals from Air Terminal Services would be only half the guaranteed rent offered by that company for the ten-year period. Indeed, according to this study, the

---

[18] This firm did not offer a bid for the concession at the new airport terminal.

514

projected percentage rentals from Air Terminal Services would be less than Interstate Hosts' guarantee, and considerably less than the projected percentage rentals computed for Interstate Hosts on the basis of that company's ratio of sales to passengers experienced at other airport operations, despite the lower percentages bid by Interstate Hosts.[19] Plaintiff vigorously attacks the validity of the assumption, made in this study, that conditions at the airports from which Air Terminal Services' experience ratio was derived were comparable.[20] By the same token, the assumption that the ratio of sales to passengers experienced at the old airport terminal by the former concession holder would be duplicated by another operator at the new airport terminal, is subject to attack. In short, it was purely conjectural that the percentage rentals would equal or exceed the guaranteed rent irrespective of what bid was accepted. The minimum rent guarantee served a definite purpose. We proceed with our inquiry into the question previously put: How well assured was the amount of Air Terminal Services' guarantee should the operation of the concession not produce the guaranteed rent?

As of June 30, 1960 Air Terminal Services showed paid-in capital and surplus in the sum of $1,021,832.83, of which $485,086.00 was invested in subsidiaries, $70,819.07 was an amount owed it by Sportservice Corporation (holder of one-third of the stock), and $162,327.68 was invested in equipment and improvements (presumably at

---

[19] Air Terminal Services bid 17.1% of liquor sales and 13.6% of food sales as percentage rentals to be paid if the rent so calculated should exceed the guaranteed rent, while Interstate Hosts bid 13% of liquor sales and 8% of food sales.

[20] Plaintiff further contends that it was improper for the Commission to determine who was the high bidder on the basis of estimates as to different volumes of business to be engendered by each. That matter is not now under consideration. At this point we are considering how well assured was Air Terminal's minimum guaranteed rent.

other concessions operated by Air Terminal Services), leaving approximately $300,000 in quick assets. Furthermore, Air Terminal Services had showed annual net income from its existing operations in the amount of approximately $150,000 during the past few years.

Air Terminal Services' bid called for an investment in improvements and equipment at Honolulu International Airport in the amount of $800,000, as against $1,120,289.28 on the part of Interstate Hosts. According to the information furnished to the Commission, this $800,000 investment would be financed by cash available and a line of banking credit. Cash available was said to be "the approximate amount of $450,000."

The evidence shows that on the advice of the Attorney General, who had raised a question as to the financial ability of this bidder, the Commission's staff, on October 11, 1960 about a month after the opening of the bids, wrote Air Terminal Services and referred to the request, made in the documents accompanying the call for bids, for furnishing of the last annual audited fiscal statement of the parent organization in case the bidder was a subsidiary, together with a balance sheet of the parent organization not more than six months old. The letter then asked for certified fiscal statements and balance sheets of the parent organization of Air Terminal Services for the past five years. In reply, by letter dated October 15, 1960, Air Terminal Services stated:

"There is no parent organization of Air Terminal Services, Incorporated. As previously pointed out, Air Terminal Services, Incorporated is one of a number of companies, all similarly owned and operated which comprise the Sportservice System. As part of our qualification proposal we submitted an unaudited balance sheet of the Sportservice System as of June 30, 1960.

Price Waterhouse & Co. is presently completing a five year audit of the System and its report and certification will be available on or about October 21, 1960. As soon as possible thereafter, we will forward the fiscal statement and balance sheet to you *should you so desire.*"[21] (Emphasis added.)

Subsequently, on October 26, 1960, as part of the report made to the Commission by the consultant retained by it, the Commission was advised that:

"Air Terminal Services, Inc. as such, is not financially capable to assume the responsibility indicated in their bid. Additional financial aid is purportedly available from other areas but this is not clear."

At the meeting of the Commission on November 10, 1960, before the Commission retired to consider the bids, each of the respective bidders at the invitation of the Commission made a presentation and answered questions. At this time the following ensued:

"COMMISSIONER TOKUNAGA: Just one other question, Mr. Kelley. I take it for granted that your representation here this morning is not only on behalf of the Air Terminal Services but also for the Sports Services?

"MR. KELLEY [Air Terminal Services' representative]: Yes, sir.

"COMMISSIONER TOKUNAGA: And whatever conditions you have outlined in your bid with Sports Services you stand ready to guarantee?

"MR. KELLEY: Absolutely.

"CHAIRMAN SYLVA: *I don't think there is anywhere in your proposal that says Sports Services.*

"MR. KELLEY: *No, I don't think it does show any*

---

[21] This Sportservice System audit was not requested by the Commission and was not furnished to it.

*place in the proposal;* however, we would be happy to give you a letter to that effect along the lines of the guarantee as outlined." (Emphasis added.)

As part of its presentation at this meeting, preceding the above, Air Terminal Services' attorney produced a letter written him by Air Terminal Services on October 12, 1960. The letter started out:

"You have indicated that there is some concern over the size of our bid at Honolulu * * *."

The letter then continued with a justification of the bid based on the estimated volume of business, after which it stated as read to the Commission by Air Terminal Services' attorney:

"First of all, we have no fear at all that we will be able to develop sufficient gross sales to more than meet our minimum guarantees. Even if this were not the case, the H.A.C. can, by contract, protect itself against any failure to perform on our part."

The attorney then explained, in evident reference to the next portion of the letter referring to the general terms and conditions issued by the Commission and particularly Articles IX and X thereof:

"* * * In other words, they are willing to go along with any control type of matters that you may have in mind so far as protecting the public is concerned for the future as far as our plans are concerned."

There was nothing whatsoever in this letter as to how the guarantee would be met if it could not be met out of the operations.

After the presentations made by the bidders at the meeting of November 10, 1960, the Commission retired to consider the bids. During the ensuing discussion, a Deputy Attorney General "reiterated the information which he had given to the Commission before relative to

certain doubts as to the financial ability of Air Terminals," as testified by the Commission's Director of Aeronautics.

Aside from the question whether a bid may be amended, after the bids have been opened, by the offer of a guaranty by an entity or entities other than the bidder, there is a question whether the mere offer of a letter of guaranty merits serious consideration. In *State ex rel. Magnolia Park, Inc.* v. *Louisiana Racing Comm'n,* 231 La. 720, 92 So. 2d 699, decided in 1956, Magnolia Park, Inc., a member of the Sportservice System, was involved. Magnolia Park sought a writ of mandamus to compel the Louisiana State Racing Commission to issue a racing permit to it and nullify that issued to another group. Such writ was ordered by the trial court but the supreme court reversed on the ground no abuse of discretion had been shown. The following is from the supreme court opinion:

"Realizing that its financial condition was extremely precarious, * * * Magnolia attached to its original application a letter dated August 14, 1956 addressed to the Commission from Sportservice Corporation and signed by Mr. Louis Jacobs, President,[22] in which letter it is stated that upon certain conditions (four in number) Sportservice 'hereby commits itself to loan or cause to be loaned such operational funds as may be required * * *.'

"Mr. Louis Jacobs, President of Sportservice of Buffalo, New York, and author of the letter presented by Magnolia did not appear before the Commission and there was no resolution of the corporation authorizing the conditional loan filed in this case. Mr. McQuaid, an officer of New Orleans Sportservice, testified that he was not an officer of the Sportservice Corporation of

[22] Mr. Jacobs is the same person who, as President of Air Terminal Services, wrote the above-noted letter of October 15, 1960.

Buffalo, New York, and had no knowledge of any resolution being passed by the board of that corporation authorizing the conditional loan and admitted that he did not know whether Mr. Jacobs had a right, under the charter of that corporation, to grant a loan." (231 La. at 726-27, 92 So. 2d at 701-02.)

Plaintiff adduced evidence in the present case that: "It has been a policy of always standing behind each of the corporations and guaranteeing the corporation," in answer to a question whether the entire Sportservice System stood behind the obligations of each corporation in the Sportservice System. Plaintiff asserts in its brief: "* * * [I]f the Appellees really did desire the guarantee of Sports Services, they could have asked for it. And such guarantee could have been drafted in such manner as to impose a binding and legal obligation upon Sports Services, the dicta in *State* v. *La. State Racing Commission,* 231 La. 720, 92 So. 2nd 699 (1957) notwithstanding."

This argument misses the point. The question is not whether the bid of Air Terminal Services *could* have been accepted had the Commission made efforts to get it into an acceptable form. Instead, the question is whether the bid was a good bid which the Commission *should* have accepted. A contracting officer is not obliged to make an award of contract on the assumption that there will be forthcoming a signature not appended to the bid itself. A properly signed bid may be required as a guarantee that the formal agreement will be executed. While the use by a bidder of an inexact name may not be a fatal defect where the identity of the bidder is clear and remains the same throughout, no case has come to our attention where the bid was made by one corporation and the guaranty of another corporation (not the parent or successor) added at a later point. An obvious question arises as to whether

such course is permissible. In any event it is a course which may be rejected by the contracting officer. *Cf., Smith* v. *Holmes County,* 242 Miss. 750, 137 So. 2d 195; *Interstate Power Co.* v. *Town of McGregor,* 230 Iowa 42, 296 N.W. 770; *Prendergast* v. *City of St. Louis,* 258 Mo. 648, 167 S.W. 970; *Application of Glen Truck Sales & Service, Inc.,* 32 Misc. 2d 861, 224 N.Y.S.2d 199; *Hines* v. *City of Bellefontaine,* 74 Ohio App. 393, 57 N.E.2d 164, 176; *Nielsen* v. *City of St. Paul,* 252 Minn. 12, 88 N.W.2d 853.

Plaintiff Air Terminal Services, as will appear, deliberately elected not to assume the burden of showing that its bid should have been accepted as a responsible bid. In *Wilson* v. *Lord-Young Engineering Co., supra,* 21 Haw. 87, a suit brought by an unsuccessful bidder as a taxpayer, on which plaintiff strongly relies, it is stated at page 89: "The trial judge found as a fact that the complainant was the lowest responsible bidder and the finding was fully supported by the evidence." In *Housing Authority of the City of Opelousas* v. *Pittman Constr. Co., supra,* 264 F.2d 695 (5th Cir.), *affirming* 167 F. Supp. 517 (W.D. La.), another case on which plaintiff has put much emphasis, the trial judge found: "Plaintiff is a responsible contractor. * * * [F]inancial resources are exceptionally good * * *." (264 F.2d at 703, note 11.) A third case stressed by plaintiff is *Brown* v. *City of Phoenix, supra,* 77 Ariz. 368, 272 P.2d 358. The record in that case, as reviewed by the court, contained nothing raising a doubt as to the responsibility of the unsuccessful bidder, who was the franchisee of the Hertz-Driv-Ur-Self System, competing for the concession against the franchisee of the Avis Rent-a-Car System. It was conceded "that plaintiff could perform the contract and that his personal integrity and business ability are the finest." 77 Ariz. at 375, 272 P.2d at 363.

In this case the record shows doubts raised before the Commission as to the responsibility of Air Terminal Services. These doubts did not come as a surprise to the plaintiff. The report made to the Commission on October 26, 1960, above quoted, was listed in the pre-trial order as an exhibit to be admitted into evidence subject to objections as to relevancy, materiality, or competency. As set out in the pre-trial order, it was conceded that this report was considered and relied upon, in part, in the award of the contract. A deposition taken before trial reveals that plaintiff was handed a copy of the report as early as February 1961, or five months before the filing of the pre-trial order and the commencement of the trial. Plaintiff already knew, from the questions asked at the meeting of November 10, 1960, that a doubt had been raised as to whether the financial resources of Air Terminal Services itself, apart from those of the Sportservice System as a whole, were sufficient to stand back of the bid made. As early as October 12, 1960, as shown by Air Terminal Services' letter of that date, it was known that there was concern over the size of Air Terminal Services' bid. This was about the time when Air Terminal Services received the Commission's letter asking for additional financial data and was informed that: "There is no parent organization of Air Terminal Services, Incorporated."

At the trial plaintiff objected to testimony of the Commission's Director of Aeronautics as to discussion by the Commission of the reasons upon which the vote to award the contract to Interstate Hosts was based. The objection —that this was hearsay—was sustained. However, the record shows that a doubt as to the adequacy of Air Terminal Services' financial resources was part of the history and circumstances of this case. As stated in *Marshall Constr. Co.* v. *Bigelow, supra,* 29 Haw. 641, 655:

"* * * The law, however, does not require that the reasons moving the members of the board in taking action be set forth in the minutes in order to be available to them thereafter in defense of their action when attacked in court. It does not even require that the members should state either in writing or orally at a meeting or meetings of the board what their reasons are. One member may be actuated by one lawful reason and another by another lawful reason. They may all remain silent at the meetings except to cast their votes in favor of rejection and yet their acts may be valid. If the history and the circumstances of the case are such that the court can find from the evidence that reasonable men, acting in good faith only, could reach the conclusion which they did reach, rejecting both bids, their action must, in the absence of evidence of fraud or wrong motive, be sustained. The discretion to act was theirs and is not given to the court. The court cannot pass upon the facts in review of their judgment further than to find whether they acted in good faith, for one or more of the reasons named in the statute, and reasonably could have so acted. * * *"

*Accord: West* v. *City of Oakland,* 30 Cal. App. 556, 562, 159 Pac. 202, 205, holding that it is "not necessary for a municipal board in making a record of its action in the rejection of certain bids, to also make an entry of its reason for so doing, but that the real reason for its action might be shown upon the trial of the case involving the validity and integrity of the action of the board."[23]

Plaintiff could have proceeded as in *Wilson,* by adducing evidence to dispel the doubts as to the responsi-

---

[23] The present case is distinguishable from *Pearlman* v. *Pittsburgh,* 304 Pa. 24, 155 Atl. 118, and *Kratz* v. *Allentown,* 304 Pa. 51, 155 Atl. 116, in which doubt was raised as to the performance of the unsuccessful bidder on immaterial points, the court being satisfied on all material points.

bility of Air Terminal Services. As stated in *Wilson* at page 94:

"* * * At the hearing in the court below Wilson testified in explanation as to why he had not fulfilled those two contracts [nonfulfillment of which had been of concern] and adduced testimony of disinterested witnesses as to his skill, ability and experience as a builder of roads, as well as to his business integrity, and if an opportunity had been given him to present the evidence to the commissioners it would probably have sufficed to convince them of Wilson's responsibility."

Plaintiff, instead of proceeding as in *Wilson,* elected to rely entirely upon alleged procedural defects in the Commission's action, as now seen.

Up to the time of trial the complaint herein contained a third cause of action, set forth in the pre-trial order as follows:

"(3) Under the third causes of action, Petitioners allege that even if the Court should hold that the Commissioners, up to the time of the award of contract, had discretion to reject the bid of the highest bidder on the ground that it was not responsible, that finding as applied to Air Terminal Services, Inc., if in fact made, was unreasonable, arbitrary and capricious because (a) there were no facts or information before the Commissioners to reasonably justify such finding, and (b) Air Terminal Services, Inc. was never notified in what particulars it was deemed not responsible and was not afforded the opportunity to be heard thereon."

At the commencement of the trial plaintiff amended the complaint by deleting this third cause of action, its attorney stating that "on reconsideration we feel that it's not our theory of the case at all, that it would only serve to prolong the trial * * *." In other words, plaintiff elected

not to assume the burden of showing that it would have been unreasonable for the defendant to reject its bid as not responsible.

Plaintiff contends under section 2 of the governing statute[24] (Act 245, S.L. 1959, as amended by Act 14, S.L.

[24] The pertinent provisions of the governing statute, as they read at the time of the call for bids and contract award, were as follows:

"SECTION 2. *Qualification of bidders.* Before any prospective bidder shall be entitled to submit any bid for the occupancy of any such space, he shall, not less than six calendar days prior to the day designated for opening bids, give written notice to the officer charged with letting such contract of his intention to bid, and such officer shall satisfy himself of the prospective bidder's financial ability, experience and competence to carry out the terms and conditions of any contract that may be awarded. For this purpose, such officer may, in his discretion, require prospective bidders to submit answers, under oath, to questions contained in a form of questionnaire setting forth a complete statement of the experience, competence and financial standing of such prospective bidders. Whenever it appears to such officer, from answers to the questionnaire or otherwise, that any prospective bidder is not fully qualified and able to carry out the terms and conditions of the contract that may be awarded. such officer shall, after affording such prospective bidder an opportunity to be heard and if still of the opinion that the bidder is not fully qualified to carry out the terms and conditions of the contract, that may be awarded, refuse to receive or consider any bid offered by such prospective bidder. All information contained in the answers to questionnaires shall remain confidential, and any government officer or employee who knowingly divulges or permits to be divulged any such information to any person not fully entitled thereto shall be fined not more than $250. Questionnaires so submitted shall be returned to the bidders after having served their purpose.

\* \* \* \* \* \* \* \* \*

"SECTION 4. *Bids; opening; rejection.* The time of opening of such tenders shall be not less than five days after the last publication. All bids shall be sealed and delivered to the officer advertising therefor and shall be opened by him at the hour and place to be stated in the call for tenders in the presence of all bidders who attend, and may be inspected by any bidder. All bids which do not comply with the requirements of the call for tenders shall be rejected. The officer calling for bids may reject any or all bids and waive any defects when in his opinion such rejection or waiver will be for the best interest of the public.

\* \* \* \* \* \* \* \* \*

"SECTION 8. *Contracts to be in writing; highest responsible bidder.* All such contracts shall be in writing; shall be executed by the officer letting the same in the name of the Territory, county, or the board, bureau or commission thereof authorized to let contracts in its own name, as the case may be, and shall be made with the highest responsible bidder, if such bidder shall qualify by providing the security required by Sections 9 and 10 of this Act. If the highest and best bid or any other bid has been rejected, or if the bidder to whom the contract was awarded has failed to enter into the contract and furnish satisfactory security, the officer may, in his discretion, award the contract to the next highest and best remaining responsible bidder."

1960, as set out in the 1961 Supplement to the Revised Laws of Hawaii 1955, c. 7B) that the Commission at the time of opening of the bids found all of the bidders qualified, and that that was the end of the matter. Even if a bidder could be disqualified after the bids were opened (which plaintiff contests) at all events that would require a public hearing, it is contended. Further, plaintiff argues that the meeting of November 10, 1960, though the trial court deemed it a "proper public hearing," cannot be deemed such.

As stated by plaintiff's counsel in the trial court: "* * * Our theory of the case is a very simple one. It has been stated by Mr. Chun in the Pre-trial Order and in the deletion of the third cause of action. It is simply that we have been qualified, that the bids speak for themselves, and it's just a matter of a ministerial duty on the part of the Commission, a matter of mere arithmetic. It doesn't even take arithmetic to see which is the highest bidder." Adhering to this position at the close of the evidence, plaintiff's counsel stated: "* * * [W]e stand on the statute here, * * * that if any of these matters are material * * * that the Commission should have accorded us a hearing, and this is not the place to have the hearing."

As explained in plaintiff's brief in this court: "It [the third cause of action] was deleted for the simple reason that Appellants felt then, and urge now, that § 2 does, in fact, prescribe the exclusive method by which the responsibility of bidders is determined. This being so, the third causes of action are unnecessary. Consistent with this view, Appellants in the proceedings below made timely objection to Appellees evidence of Air Terminal Services' lack of responsibility. The Court below over objection of Appellants allowed such evidence. Appellants urged then, and urge now, that such 'evidence', aside from being irrele-

vant, is incompetent, insubstantial and predicated on spurious premises."

After deletion of the third cause of action only the second cause of action supported the second prayer of the complaint, seeking a writ commanding defendant "to forthwith exercise in good faith any discretion that may be vested in [him] to determine which among the bidders is the highest responsible bidder." As construed by plaintiff the second cause of action has to do with any discretionary authority there may be "to determine which among the bidders had in fact submitted the highest bid * * *." Thus this prayer of the complaint, though remaining in its original form despite the deletion of the third cause of action, does not relate to responsibility. Plaintiff's contention is, as stated in oral argument, that if there was any procedural defect on the part of the Commission in passing upon its responsibility the contract made with Interstate Hosts should be declared void.

It was conceded by the Commission that: "At no time prior to the opening of the bids on September 15, 1960 did the Commission give any Notice to any bidder that any bidder did not have the financial ability, experience and competence to carry out the terms and conditions of the contract that would be awarded, or that any bidder was not fully qualified and able to carry out the terms and conditions of the contract that would be awarded." The trial court found that, by the receipt and opening of the bids, the Commission "must have found all bidders to have at such time satisfied the prerequisites of Section 2, Act 245, S:L. 1959." This finding is clarified by the trial court's second and third conclusions of law, which read: "2. Section 2 of Act 245, S.L.H. 1959, makes provision at a preliminary stage for a procedure which may be used to determine whether a prospective bidder is qualified to have its

bid considered, but Section 2 does not limit the exercise by the Respondents of the discretion to determine a bidder's responsibility to the period only prior to the receipt and opening of the bid proposals. 3. The Respondents were vested with the statutory authority pursuant to Section 8 of Act 245, S.L.H. 1959, to exercise discretion even after the opening of bids on September 15, 1960 to determine which of the bidders was the 'highest responsible bidder' within the meaning of said Section 8."

As we construe the statute, the words "any contract that may be awarded" in section 2 are not used with any thought that responsibility must be judged solely at the point when the contract is in an embryo stage, as distinguished from the time when the contract has been formulated by the receipt of bids that fill in the blanks in the contract. The receipt and consideration of the bid signify merely that the bidder is not out of the running,[25] or to use the words of the third sentence of section 2 of the statute, the bidder has not been disqualified as one "not fully qualified and able to carry out the terms and conditions of the contract that may be awarded." If the contract may be such as he is fully qualified to carry out, he cannot be disqualified under section 2.

In contradistinction to R.L.H. 1955, §§ 9-24, 9-26 and 9-30, which contain somewhat similar provisions governing the construction of public works, the statute here applicable deals with the letting of concessions at a price to be paid by the bidder, not the State or other agency letting the contract. Financial responsibility for the price as bid cannot be fully judged before the bid is made. The contracting officer still has the power to reject any bid "when

---

[25] Prequalification, when properly provided for, permits the limitation of bidders to those who show in advance that they are qualified. *Corcoran* v. *Philadelphia*, 363 Pa. 606, 70 A.2d 621; *cf.*, *Harris* v. *Philadelphia*, 299 Pa. 473, 149 Atl. 722; *J. Weinstein Bldg. Corp.* v. *Scoville*, 141 Misc. 902, 254 N.Y. Supp. 384.

in his opinion such rejection * * * will be for the best interest of the public" (section 4) and still has the duty of selecting the highest *responsible* bid (section 8). At least when, as here, the amount of the bid—$1,838,000 in excess of, or 76% more than that of any other bidder—gives a sharp edge to doubts raised by the record before the contracting officer as to the stability of the bid,[26] the evaluation of the financial resources back of the bid was not only a right but a positive duty. *United States* v. *Purcell Envelope Co.*, 249 U.S. 313, is not in point because the bid of Air Terminal Services has never been accepted.

We are inclined to agree with plaintiff that on any point of doubt as to its responsibility a hearing should have been held; if not under section 2 then it should have been held under this court's pronouncement in *Wilson* that: "The refusal to award a contract to the lowest bidder can be justified only when it has been made to appear upon a proper hearing and investigation that he is not a responsible bidder." (21 Haw. at 94.) We are inclined also to agree with plaintiff that the meeting of November 10, 1960, was not such a hearing as was called for, and that the trial court, which characterized it as a "proper public hearing," erred in that respect.

However, the record indisputably shows a doubt raised before the Commission as to the adequacy of Air Terminal Services' financial resources to sustain its bid. Despite all of the evidence taken and all of the arguments presented that doubt remains. Plaintiff deliberately elected not to attempt to resolve it, and to depend entirely upon its con-

---

[26] We note that there was evidence that at New Orleans, Interstate Hosts bid a minimum guarantee of $5,750,000 for a 14-year contract as compared with "about two million dollars less" offered by the next highest bidder for that concession. Such evidence serves to show that bidders may size up a given situation very differently, but has no bearing on the question at hand as to the financial resources back of the higher bid here made.

struction of the statute and a stipulation obtained as to the financial resources of the Sportservice System, which however did not sign the bid.

The stipulation agreed to as to the sufficiency of the financial resources of the Sportservice System was specifically predicated upon the words: "* * * [H]ad Sportservice signed the bid and made the bid in this case * * *." After the making of this stipulation the following ensued:

"MR. WEISS [plaintiff's counsel] : I would also now ask for the same stipulation with respect to Air Terminal Services, because assuming that—I say we can prove that Sportservice Corporation was behind this, but in the event that your Honor would find that I had not so proved, I would feel that I had to make the similar proof as to Air Terminal Services, that even leaving Sportservice out of this, they were financially responsible.

"THE COURT: All right, you may proceed.

"MR. MOORE [defendant's counsel] : I am not willing to so stipulate, your Honor. I want to get the record clear."

Though plaintiff's counsel at that time felt he had to prove the financial responsibility of Air Terminal Services he subsequently returned to his original position above stated, informing the court: "* * * [W]e are going to stand by our original theory of the case as presented to you and not bring in any rebuttal testimony."

Notwithstanding the misconstruction of the statute by the Commission, the doubt as to the adequacy of Air Terminal Services' financial resources had to be resolved in some way. Otherwise the public would be penalized for the error of the Commission in not holding a proper hearing. *Wilson* v. *Lord-Young Engineering Co., supra,* 21 Haw. 87, 89-90, does not hold that a case can be made out by a mere

showing of failure to fully investigate plaintiff's qualifications and hold a proper hearing thereon. What it does hold is that presentation of evidence of responsibility of the unsuccessful bidder coupled with a finding of responsibility by the trial judge is conclusive in a taxpayer's suit seeking rescission of the award made, when the awarding authority has made no proper investigation and has held no proper hearing.

As Air Terminal Services has not satisfied or sought to satisfy the court as to the adequacy of its financial resources, it has not shown a clear legal right to the contract. We turn now to the taxpayer's suit.[27]

### Taxpayer's Suit

The first and second causes of action in the taxpayer's suit are disposed of by what has been said as to the unavailability of mandamus where the performance of the contract has proceeded as far as it has here. And as has been noted, mandamus could not be founded on these causes of action for the additional reason that the contracting authority had discretion to reject all bids, and plaintiff could not complain that such action would be arbitrary since the work has proceeded too far to enable the contract to be let on the original terms.

As to the last cause of action, designated "fourth," as above set out this presented the contention that the specifications were fatally defective, and that any award based thereon was void. This contention was presented solely by the taxpayer's suit. The contention made by defendant in this suit that injunctive relief was the proper remedy, not mandamus, was well taken. *Castle* v. *Kapena,* 5 Haw. 27, 38. Plaintiff argues that under the Hawaii Rules of Civil Procedure, *Castle* v. *Kapena* should no

---

[27] Plaintiff, as hereafter used, refers to Ellen Lowe Sham who brought the taxpayer's suit.

longer be followed. But as noted, by reason of the dismissal of Interstate Hosts, which dismissal was "with prejudice" after failure to amend, it has become the law of this case that the action is strictly a mandamus action.

Plaintiff further contends that by the pre-trial order defendant waived the contention, made by the earlier motion to dismiss which the trial court denied, that a taxpayer's contention of invalidity of the specifications could not be presented by a mandamus suit. We find it unnecessary to decide whether the point has been waived. Assuming without deciding that notwithstanding the form of action and dismissal of Interstate Hosts with prejudice we could declare the contract void, we proceed to the question whether it is our duty to review the legality of the specifications and enter a declaratory judgment, in other words, whether declaratory relief is called for by the "fourth" cause of action though for reasons already stated no writ could be issued on the judgment. *Cf., Detroit Free Press Co.* v. *Board of State Auditors, supra,* 47 Mich. 135, 144, 10 N.W. 171, 175. The test to be applied was well stated by Mr. Justice Frankfurter writing for the Court in *Eccles* v. *Peoples Bank of Lakewood Village,* 333 U.S. 426, 431:

"A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest. [Citations.] It is always the duty of a court of equity to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief. Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative."

*Accord: Public Affairs Associates* v. *Rickover,* 369 U.S. 111.

532

This court held in *Munoz* v. *Commissioner of Public
Lands, supra,* 40 Haw. at 682, that pecuniary damage to
the plaintiff as a taxpayer and taxpayers as a class is a
requisite of a taxpayer's suit. In some situations such
damage may be presumed. *Wilson* v. *Stainback,* 39 Haw.
67, 72. Thus in *Castle* v. *Kapena, supra,* 5 Haw. 27, it was
indicated that an injunction would have been issued, had
it been sought, to restrain the defendant from issuing gold
par bonds for silver half dollars worth 82% of gold dollars
when under the statute the bonds were not to be issued at
all unless they brought their par in gold dollars. And in
*Lucas* v. *American-Hawaiian Engineering & Constr. Co.,*
16 Haw. 80, the performance of a contract for public work
was restrained when the specifications reserved the right
to use in the new structure piles removed from the old
structure, and in consequence bidders were uncertain as
to the number of new piles called for. The court said: "If
there has been a violation or evasion of the law requiring
the awarding of the contract to the lowest bidder, after a
public advertisement for tenders, damage is presumed to
result to all taxpayers." (p. 86).

But the present case is one of sale of public property,
*i.e.,* the right of use of space in the new airport terminal.
No expenditure of public money is involved. In such case
it was held in *Munoz* that where there has been no fraud,
actual or constructive, pecuniary damage to the taxpayers
cannot be presumed, and in the absence of a showing of a
loss of revenue which will result in an increase of tax bur-
dens the case is governed by the rule that: "Mere illegality
is not enough."

The requirement that a direct pecuniary injury be
shown in a taxpayer's suit is generally recognized. Its
importance is emphasized by the holding in *Doremus* v.
*Board of Education of the Borough of Hawthorne,* 342

U.S. 429, where the court ruled that absent such showing no justiciable case or controversy was presented and the case would not be decided on the merits even if this point was waived in the court below. As stated in *Doremus* at page 434:

"The taxpayer's action can meet this [case or controversy] test, but only when it is a good-faith pocketbook action. * * *"

While the motives of the plaintiff taxpayer are not material if the taxpayer has shown a clear legal right to a remedy,[28] it is pertinent to note that the present taxpayer's suit was so framed as to serve the interests of Air Terminal Services—the last or "fourth" cause of action attacking the legality of the specifications repeats and realleges, among other allegations, the averment that Air Terminal's bid was the highest. The gravamen of the complaint was and is that the taxpayers have been deprived of the benefit of Air Terminal Services' bid, either by unjustified refusal to recognize that Air Terminal's bid was the highest, or by illegal indefiniteness of the specifications preventing an award.

Assuming without deciding that the taxpayers represented by plaintiff were entitled to have the award so handled as to redound to their benefit,[29] plaintiff taxpayer

---

[28] *Lucas* v. *American-Hawaiian Engineering & Constr. Co., supra,* 16 Haw. 80, 85; 52 Am. Jur., *Taxpayers' Actions*, § 22.

[29] See below, *circa* note 35, pointing out that under the governing statute monetary return is not necessarily an objective. *Cf., Linden Land Co.* v. *Milwaukee Electric Ry. & Light Co.,* 107 Wis. 493, 505-06, 83 N.W. 851, 855, which held that a taxpayer's suit could not be brought to test the legality of a street railway franchise where the city had rejected lucrative offers in the exercise of a broad discretion to secure public benefits in the form of lower rates of fare instead of monetary return. The court said:

"* * * When it [city council] decided that there should be no fund, but that reduced fares or other limitations upon the grant were more desirable for the public, it may or may not have exercised good discretion, but it has dissipated no city fund or property."

could attack for indefiniteness specifications which failed to produce the highest financial return, if such was the case. The evidence offered, however, was all to the effect that Air Terminal's bid showed the highest financial return if a good bid. The asserted indefiniteness of the specifications does not prevent us from ascertaining this to be the fact. Whether injury was done to the taxpayers because Air Terminal's bid was not, or by reason of indefiniteness of the specifications could not be accepted, is the turning point. Dobbs House is not involved and any discussion of Dobbs House is outside the framework of the case as fixed in the trial court.[30]

---

[30] The case was tried on the theory that only the bids of Air Terminal Services and Interstate Hosts were to be considered, and that information about Dobbs House had no bearing unless, perhaps, it affected the consistency and logic of the testimony concerning the processing of the bids of Air Terminal Services and Interstate Hosts. This appears from the following:

"Q (By Mr. Weiss [counsel for plaintiff]) : Mr. Der Yuen, I'm going to leave this report for the time being and ask you if you will be good enough to produce for me the notes that you used at the office, the meeting in Tim Ho's office on this early November day and which are reflected in Exhibits D-1, 2 and 3 and D-1A, D-2A and D-3A on the blackboard.

"MR. MOORE [counsel for defendant] : I'm going to object, your Honor, on the ground that such notes, as has already been testified, contained information with regard to Dobbs House and have nothing whatsoever to do with this case, and the witness has also testified that those figures that he put on the board are identical to the ones that he used from his notes on that date, with the exception of the deletion of Dobbs House, Limited, in the presentation.

"THE COURT: The purpose of the notes, Mr. Weiss?

"MR. WEISS: Credibility, your Honor.

"THE COURT: Have you got the notes available?

"THE WITNESS: It's fortunate I didn't tear these up.

"THE COURT: If the notes are available, I will allow it, being limited, of course, to the two bidders.

"THE WITNESS: My notes show the three bidders.

"THE COURT: You can segregate them.

"THE WITNESS: Well, but my notes had the three bidders at the time.

"THE COURT: Yes, I understand.

"THE WITNESS: And they are all on one piece of paper.

"THE COURT: What happened to the fourth bidder?

"THE WITNESS: We were only asked to evaluate three bidders.

"MR. WEISS: I intend to go into that also, your Honor, and I do think, although I won't press it at this time, that his explanation as to Dobbs House is also material, it *may be material insofar as I*

Taking the case as thus presented, and considering the matter as we do from the standpoint of what should be done when possession has been taken and part performance rendered under an executed contract, we are not convinced that the taxpayer has made out a case for exercise of the power to enter a declaratory judgment. The taxpayer should have shown that Air Terminal Services' bid was a good bid, backed by financial resources sufficient to assure payment of the guaranteed rent,[31] the loss of which has increased the burdens of the taxpayers. The latter point merits further consideration.

The complaint alleged that the State had issued both Aviation Revenue Bonds,[32] and $5,385,601 in general obligation bonds for airport purposes; that the Aviation Revenue Bonds were a first charge on the revenues from airport operations (including concession revenues), and on the airport fund derived from aviation fuel taxes; that in the event of an insufficiency, after all expenditures for opera-

---

*can use it as a—if I can use it as an explanation why it doesn't logically hang together*, that is, if what he says about Air Terminal Services doesn't hold true for Dobbs, then his whole thesis may be destroyed.

"THE COURT: But he did insert at least three bids.

"MR. WEISS: Yes, and what I meant, I may, subject to objection, want to ask him about if he did the same thing with Dobbs House, *just as an indication of whether he has been consistent and whether the same logic applies.*

"MR. MOORE: Your Honor, this is just another way of getting into evidence in this case Dobbs House, Incorporated, and I must object.

"MR. WEISS: I said subject to your objection.

"MR. MOORE: Oh, fine." (Emphasis added.)

[31] The case might stand differently if a minimum guaranteed rent had not entered into the bidding. In the present case we are considering the pecuniary injury to taxpayers from the rejection of one bid and the acceptance of another, when each bidder has offered a guaranteed rent and a percentage rental to be paid if the latter exceeds the guaranteed rent but the volume of business is speculative.

[32] The complaint cited as the authority for these bonds Public Law 85-534 (72 Stat. 379), and R.L.H. 1955 (1957 Supp.) § 137-94, which is set out together with related provisions in Part V of chapter 137, R.L.H. 1955 (1963 Supp.).

tion and maintenance of the airport and payments on the revenue bonds, of revenues for servicing the general obligation bonds, the burden thereof would fall on the taxpayers. The evidence showed, however, that the minimum rent guaranteed by Interstate Hosts, with other revenues, offered sufficient coverage for the bonds.

The complaint further alleged that if revenues were insufficient to operate and maintain the airport and make payments on the Aviation Revenue Bonds, aviation fuel taxes or landing fees or both would be increased and this ultimately would be passed on to users of public air transportation, also represented by plaintiff Ellen Lowe Sham. These allegations are too speculative to merit consideration.[33]

There having been no clear showing of direct pecuniary injury, the court will not accord relief at this stage of the case even though a less exacting standard of proof might perhaps have been applied under different circumstances. We deem it unnecessary to consider whether positive damage to the public would ensue should declaratory relief be granted, our position being rather that the case falls into the category where, as stated in *Munoz* v. *Commissioner of Public Lands, supra,* 40 Haw. at 685, quoting from *Rushing* v. *Lynch,* 22 S.W.2d 482, 484 (Tex. Civ. App.): "The remedy of action against the wrongful sale would lay with the public, considered as a whole or in the collective sense, acting through duly constituted officers." Here the

---

[33] As stated in *Linden Land Co.* v. *Milwaukee Electric Ry. & Light Co., supra,* 107 Wis. 493, 502, 83 N.W. 851, 854:
"* * * It is familiar law that courts do not revise, control, or vacate the acts of a municipal government at the suit of private persons, except as incidental or subsidiary to the protection of some private right or prevention of some private wrong. [Citations.] The private person so suing must show something more than a mere speculative or theoretical wrong or illegal act. He must show an actual or threatened invasion or destruction of a distinct right belonging to himself or to the body of citizens for whom he sues. He cannot sue to prevent an act merely because it is illegal. * * *"

contest is between a taxpayer, seeking to represent all taxpayers, and a public officer defended by the Attorney General. To wrest the enforcement of the laws from the Attorney General into the hands of the taxpayers in a situation such as that with which we are here confronted, more must be shown than has been shown here.

*Contention that Defendant Conceded Air*
*Terminal Services was a Responsible Bidder.*

We have not overlooked plaintiffs' contention that defendant conceded that Air Terminal Services was a responsible bidder. No such concession was made. In argument in the trial court at the close of the case, defendant expounded the theory—which has also been expounded here—that the Commission could award the bid to Interstate Hosts upon finding that it was the "highest responsible bidder" without positively disqualifying Air Terminal Services. The Commission relied upon a long line of cases[34] holding that a contracting officer though required to let the contract on bids has a wide discretion to award the contract upon consideration of the qualifications of the bidders and other factors bearing on satisfactory performance as well as the amounts of their bids. As argued in the trial court: "* * * [W]e are saying that the Commission, whether you agree with it or not, had the perfect right to say, 'We want the person that we think can do the better job.' " This construction of the statute had particu-

---

[34] *West* v. *City of Oakland*, 30 Cal. App. 556, 159 Pac. 202; *McNichols* v. *City & County of Denver*, 130 Colo. 202, 274 P.2d 317; *People* v. *Kent*, 160 Ill. 655, 43 N.E. 760; *Stubbs* v. *City of Aurora*, 160 Ill. App. 351; *Williams* v. *City of Topeka*, 85 Kan. 857, 118 Pac. 864; *R. G. Wilmott Coal Co.* v. *State Purchasing Comm'n*, 246 Ky. 115, 54 S.W.2d 634; *Slocum* v. *City of Medford*, 302 Mass. 251, 18 N.E.2d 1013; *In re Kaelber*, 281 App. Div. 980, 120 N.Y.S.2d 566, *aff'd*, 305 N.Y. 858, 114 N.E.2d 211; *Application of Limitone*, 21 Misc. 2d 376, 189 N.Y.S.2d 738; *State* v. *City of Cleveland*, 61 Ohio L. Abs. 316, 104 N.E.2d 68 (Ct. App. Ohio); *Brener* v. *City of Philadelphia*, 305 Pa. 182, 157 Atl. 466; *Reuting* v. *City of Titusville*, 175 Pa. 512, 34 Atl. 916; *Taylor* v. *County Board of Arlington County*, 189 Va. 472, 53 S.E.2d 34.

lar appeal since the contract to be let was for services not lending themselves to the formulation of exact standards. The statute itself, particularly as amended by Act 14, S.L. 1960, recognized that monetary return was not necessarily an objective.[35] Though the statute provided for award to the "highest responsible bidder" it used as equivalent language "the highest and best bid," "the highest and best * * * responsible bidder."[36] Nevertheless, with exceptions

[35] As amended by Act 14, S.L. 1960, prior to the putting out of the call for bids, which was in June, 1960, the statute permitted concession space to be set aside without any charge therefor.

Compare section 1 of Act 5, S.L. 1962, reciting a purpose to obtain "the most favorable returns to the State" at the new airport. The word "returns" is used here in the sense of "results." Webster's Third New International Dictionary, "return" as a noun, par. 4c(2). Considering the subject matter, the quoted language does not necessarily connote the highest financial returns. *Cf., United States v. Union Pacific R.R.*, 32 F. Supp. 917, 34 F. Supp. 4, 7 (W.D. Mo.), *modified on another point*, 313 U.S. 450; *State ex rel. Parker v. Kansas City*, 151 Kan. 1 and 2, 97 P.2d 104, 98 P.2d 101. So, in *Fasi v. Land Commissioner*, 41 Haw. 461, it was held that under the statute there applicable the amount of money to be realized was not the sole criterion by which the public officer making the sale was to be guided, the development of the area or community in which the lands were located being a legitimate consideration.

[36] *Cf., Baskett v. Davis*, 311 Ky. 13, 223 S.W.2d 168 ("The bidder who offers the most money is not necessarily the highest and best bidder") ; *State ex rel. Fischer Constr. Co. v. Linzell*, 101 Ohio App. 219, 137 N.E.2d 427 (an allegation that relator had prequalified and was the lowest competent and responsible bidder was not sufficient, and allegation that relator was "the lowest and best bidder" was essential, where that was the statutory language; as to Ohio rule see further *State ex rel. Walton v. Hermann*, 63 Ohio 440, 59 N.E. 104, and *Altschul v. City of Springfield*, 48 Ohio App. 356, 193 N.E. 788, holding that a statute providing for award to the "lowest and best bidder" confers discretion) ; *McDonald v. Price*, 45 Utah 464, 146 Pac. 550, 552 ("highest responsible bidder" means "the bidder who will pay the highest amount of rent or render the greatest amount of service under the terms and conditions proposed") ; *Donna Independent School Dist. v. First State Bank*, 227 S.W. 974 (Tex. Civ. App.) ("The best bid would not necessarily be the highest bid"). See also *R. G. Wilmott Coal Co. v. State Purchasing Comm'n, supra*, 246 Ky. 115, 54 S.W.2d 634, 635; but see *Fetters v. Mayor & Council of Wilmington*, 31 Del. Ch. 364, 74 A.2d 470.

Compare R.L.H. 1955, § 9-30, relating to the construction of public works where the language used is "lowest responsible bid" without any reference to "best." That word has appeared in Act 245, S.L. 1959, the statute here applicable, since its inception. As shown by Standing Committee Report No. 619, Thirtieth Territorial Legislature, Regular Session of 1959 (House Journal, p. 806), in the enactment of Act 245, S.L. 1959, the provisions of chapter 9, R.L.H. 1955, were incorporated "with appropriate adjustments."

stated in the statute, it required competitive bidding and as stated in *Lucas* v. *American-Hawaiian Engineering & Constr. Co., supra,* 16 Haw. 80, 90: "Genuine competition can only result when parties are bidding against each other for precisely the same thing and on precisely the same footing."

If a particular bidder was thought to be positively unqualified, either from the standpoint of competence or any other, then under section 2 of the statute and *Wilson* there had to be a hearing thereon, following which the Commission could exercise its undoubted discretion in the matter. If such was not the situation but the quality of service, for example, was to be taken into account, the weight to be given thereto and the manner in which the quality of service was to be judged had to be set out in the bid documents. Although the Commission possessed wide discretion to decide what factors would be determinative of the award and the relative importance thereof, the only way in which it could exercise that discretion was by public announcement in the bid documents in such manner as to be intelligible to bidders in formulating their bids. The point is explained in *Wilson,* as follows: "The specifications and advertisement left the Commission at liberty to choose either a bidder who had named the lowest price and a longer period of time or one who had named a higher price and the lowest period of time. * * * There was an opportunity for favoritism and the City and County did not have the benefit of real competition measured by a common standard with the bidders on precisely the same footing." (21 Haw. at 98-99.) And as stated in *Lucas:* "A fair competition among the bidders is the prime object of such statutory provisions, and anything which tends to impair this is illegal. * * * Such a provision requires such information to be put within the reach of bidders as will

enable them to bid intelligently * * *." (16 Haw. at 90.) Thus we disagree with the defendant's view as to the construction of the statute. The Commission did not give sufficient attention to the manner in which its broad discretion was to be exercised. But we cannot read defendant's espousal in the trial court of the construction of the statute which defendant favored as an abandonment of the second line of defense stemming from the doubts raised before the Commission as to Air Terminal Services' responsibility.[37] Defendant was merely submitting argument, during the closing argument, in response to the trial court's question: "By finding that Interstate Hosts was the highest responsible bidder, does that necessarily mean that Air Terminals was not a responsible bidder?" During the trial itself, as has been seen, defendant specifically refused to stipulate that Air Terminal Services, "leaving Sportservice out of this," was financially responsible. We think plaintiffs have been advised all along of defendant's position.

Plaintiffs Air Terminal Services and Ellen Lowe Sham have failed to make out a case for judicial intervention in respect of an executed contract, performance of which has proceeded as far as it has here. The judgments are affirmed on that ground.

*J. Russell Cades* (*Edward Y. C. Chun* on the brief, *Fong, Miho, Choy & Robinson* and *Smith, Wild, Beebe & Cades* of counsel) for plaintiffs-appellants.

*Willson C. Moore, Jr.,* Special Deputy Attorney General, (*Bert T. Kobayashi,* Attorney General, with him on the briefs) for defendant-appellee.

---

[37] In addition to the question as to the sufficiency of this bidder's financial resources to back up the bid made there were other matters which, it is contended, raised doubts as to this bidder's qualifications— these we have not felt it necessary to review. Nor have we found it necessary to consider the question whether these additional matters could and should have been investigated before the bids were opened.

DISSENTING OPINION BY MIZUHA, J.

I respectfully dissent. Defendant has waived objection to the form of taxpayer's action—that the taxpayer's contention of invalidity of the specifications could not be presented by a mandamus suit.

It has long been settled in this jurisdiction since *Lucas v. The American-Hawaiian Engineering & Construction Co.,* 16 Haw. 80, 86, that when "* * * there has been a violation or evasion of the law requiring the awarding of the contract to the lowest bidder, after a public advertisement for tenders, damage is presumed to result to all taxpayers. * * *"

I do not see how this principle as applied to a taxpayer in the *Lucas* case, *supra,* where an attack was made as to the invalidity of the specifications, is inapplicable where a taxpayer attacks the invalidity of the specifications under our public concessions statute.

*Munoz v. Commissioner of Public Lands,* 40 Haw. 675 is clearly distinguishable. In the *Munoz* case, *supra* at 685, this court stated that "although the petition alleges that the Territory 'suffered irreparable loss in that the maximum rental for parcel A-3 was not obtained pursuant to the auction,' it does not allege that such loss in revenues resulted in an increase of the appellant's tax burdens or that of taxpayers in general if such be the case and therefore is insufficient as a matter of law. * * *" Here, the taxpayer alleged:

"That if revenues were insufficient for payment on account of said Aviation Revenue Bonds, and for operating and maintenance expenses, then payments on said $5,385,601.00 general obligation bonds of the State of Hawaii and payments for operating and maintenance expenses would be required to be made by appropriation from the general funds of the State, which general funds are derived by the State through the ex-

ercise of its power of taxation; and that if said appropriations were so required to be made from the general funds of the State, Petitioner's burden of taxation, as well as those of all other taxpayers of the State of Hawaii whom she represents, would be substantially increased.

"That if revenues were insufficient for payment on account of said Aviation Revenue Bonds, and expenses of operation and maintenance, Petitioner and all other members of the public at large who utilize air transportation within the State of Hawaii, whom she represents, would be required ultimately to pay additional fees for the use of said public air transportation because of the increased cost of aviation fuel taxes and/or landing fees."

Aside from the presumption that damage is presumed to all taxpayers, it is difficult to follow the argument in the court's opinion which concludes that the taxpayer has suffered no pecuniary damage, where the bids were as follows:

(a) Ten year period of the lease (1963-1972), guaranteed annual rental:

Air Terminal Services, Inc. ......................$4,263,000
Interstate Hosts, Inc. ................................. 2,425,000
Dobbs Houses, Inc. ...................................... 2,140,000
International Airport Enterprise ........... 1,752,000

(b) Guaranteed percentage of food and beverage gross sales.

|  | FOOD | LIQUOR |
|---|---|---|
| Air Terminal Services, Inc. | 13.6% | 17.1% |
| Interstate Hosts, Inc. | 8.0% | 13.0% |
| Dobbs Houses, Inc. | 13.5% | 17.0% |
| International Airport Enterprise | 7.5% | 12.5% |

(c) Amount to be expended in the installation, fur-

nishing, and equipment of the concession lease-hold improvements and the decor therefor:

| | |
|---|---|
| Air Terminal Services, Inc. | $ 800,000.00 |
| Interstate Hosts, Inc. | 1,120,289.98 |
| Dobbs Houses, Inc. | 652,000.00 |
| International Airport Enterprise | 751,910.00 |

The total bid submitted by Air Terminal Services, Inc., the guaranteed rent, plus the improvements costs exceeded Interstate Hosts, Inc. by $1,517,710.02. This does not take into consideration guaranteed percentage of food sales which was 3.5% higher and liquor sales which was 5% higher. By some magical computation, defendant came to the conclusion that Interstate Hosts, Inc. was the highest responsible bidder under specifications which were fatally defective.

I cannot agree with the opinion which holds that the taxpayer has not made out a case for exercise of the power to declare that the contract based upon faulty specifications is null and void. The decisive question as far as taxpayer is concerned is whether the specifications were fatally defective. There is no burden upon taxpayer to show that any of the bidders were backed by financial resources sufficient to assure payment of the guaranteed rent, for it is impossible under the invalid specifications to determine who has submitted the highest monetary award.

R.L.H. 1955, § 7B-9 (Supp. 1961), (Act 245, S.L.H. 1959, § 9) provides as follows:

"SECTION 9. *Bond; conditions.* Before any contract is entered into, the party with whom the same is proposed to be made shall give security for the performance thereof by a good and sufficient bond conditioned for the full and faithful performance of the contract in accordance with the terms and intent thereof, which bond shall be in an amount equal to two months'

rental or other charge required under the contract. Such bond shall also by its terms inure to the benefit of the State or of the county, as the case may be."

Once the taxpayer has shown that the specifications are invalid, there is no additional duty on the part of the taxpayer to prove financial responsibility where all that the statute requires is a bond which could have been requested by the defendant. The burden is upon the State to prove financial irresponsibility of all the unsuccessful bidders who may have submitted a higher monetary bid if said bid was rejected on this basis.

Furthermore, there is another point which has not been considered by this court in arriving at the conclusion that although the specifications and bid documents are invalid the taxpayer must show pecuniary loss.

Dobbs Houses, Inc.—one of the unsuccessful bidders— bid on the percentage variable as compared with Air Terminal Services, Inc. and Interstate Hosts as follows:

|  | FOOD | LIQUOR |
|---|---|---|
| Air Terminal Services, Inc. | 13.6% | 17.1% |
| Interstate Hosts, Inc. | 8.0% | 13.0% |
| Dobbs Houses, Inc. | 13.5% | 17.1% |

This court states:

"We note that the guaranteed rent offered by Air Terminal Services was well within the projected percentage rentals from that company if computed on the assumption (1) that the food and liquor sales at the new airport terminal would, in relation to the volume of passenger traffic, equal those experienced by the holder of the restaurant concession at the old airport terminal; and (2) that during the ten-year period the food and liquor sales would increase commensurately with the increase in passenger traffic projected in estimates which had been issued by the State. Plaintiff

adduced testimony to that effect. * * *"

If the State had provided a common standard as to the weight of the three variables, it is possible that Dobbs Houses, Inc. would have had a higher bid than Interstate Hosts, Inc., thereby definitely establishing that the taxpayer has suffered pecuniary loss.

Here the taxpayer has clearly shown that the specifications lacked standards upon which the highest bid could be determined. The issue was first raised in a letter by Air Terminal Services' to the defendant, dated August 31, 1960:

"We are also somewhat concerned about the fact that your form of proposal requests each bidder to propose three variables, a percentage, a minimum and an amount to be expended. It is entirely conceivable that the Commission will be confronted with a high set of percentages from one bidder, a high set of minimum guarantees from another bidder and a high expenditure from still another bidder. Does the Commission have any procedure planned for determining the successful bidder in such eventuality?"

Defendant's reply prior to the opening of the bids was as follows:

"Under the question of whether or not the Commission has a procedure planned for determining the successful bidder, please be advised that at this time we do not feel able to give you further information than is contained in Paragraph 11 on page 5 of the Instruction to Bidders."

There is no expression in paragraph 11 of the Instruction to Bidders as to the relative weight to be given to the three bid variables. There is no standard whereby the defendant could determine the highest responsible bidder.

As stated in the concurring opinion in *Wilson* v. *Lord-*

*Young Engineering Co.,* 21 Haw. 87, 97-8:

"* * * Such statutory provisions are based upon motives of public economy and originate in some degree of distrust of the officers to whom the duty to make contracts for the public service is committed. *Frame* v. *Felix,* 167 Pa. St. 47. Their object is 'to prevent favoritism, corruption, extravagance and improvidence in the awarding of all public contracts. * * * A fair competition among the bidders is the prime object of such statutory provisions and anything which tends to impair this is illegal. * * * Such a provision requires such information to be put within the reach of bidders as will enable them to bid intelligently and will enable the official having charge of the proposed work to know whose bid is the lowest.' *Lucas* v. *American-Hawaiian Engineering & Construction Company, Limited,* 16 Haw. 80, 90. As stated in another case, the objects sought are 'to secure to the state the benefit and advantage of fair and just competition between bidders and at the same time close, as far as possible, every avenue to favoritism and fraud in its varied forms * * * and to insure the accomplishment of the work at the lowest price by subjecting the contract for it to public competition. * * * In order to effectuate this it is manifest that where something is to be done that is required to be submitted to competition every essential part of it that goes to make up the whole of it must be submitted to such competition.' *Frame* v. *Felix,* supra. 'The character of the work and the materials of which it shall be composed must be decided in advance.' *Lucas* v. *Construction Co.,* supra. So also should the specifications include every other element essential to furnish a common standard by which to measure the respective bids. The use in the statute of the expression 'lowest (respon-

sible) bidder' necessarily implies as much. Any indefiniteness in the specifications permitting of favoritism or rendering it impossible to determine by a common standard which is the lowest bidder frustrates the purpose of the statute and invalidates the award and contract. *Mazet* v. *Pittsburgh,* 137 Pa. St. 548; *Ertle* v. *Leary,* 114 Cal. 238; *Ricketson* v. *Milwaukee,* 47 L. R. A. (Wis.) 685; *Chippewa Bridge Co.* v. *Durand,* 99 N.W. (Wis.) 603. 'Genuine competition can only result when parties are bidding against each other for precisely the same thing and on precisely the same footing.' *Lucas* v. *Construction Co.,* supra."

This court has conceded that the specifications upon which bids were tabulated were fatally defective, yet adheres to the principle that the taxpayer must prove pecuniary loss. I see no justification to abandon the principle stated in the *Lucas* case, *supra,* that damage is presumed to result to all taxpayers. This is not a situation where a bid has been awarded to the second highest monetary bidder upon valid specifications, the highest monetary bidder being rejected because of financial irresponsibility. Here, it is impossible to prove pecuniary loss because there are three bid variables and there is no common prescribed standard to be used in arriving at the highest monetary bidder. Since the specifications and bid documents upon which bids were solicited are void and contrary to law, I would set aside all proceedings of the defendant's relating to the contract for restaurant and other food and beverage facilities and vacate the judgment below.